FILED

NOVEMBER 8, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

07 C 6356

JUDGE CASTILLO
MAGISTRATE JUDGE BROWN

# EXHIBIT 1

# L E A S E

between

**Sunil DeKalb, L.L.C.,**

an Illinois limited liability company,

Landlord,

and

**Mattress Giant Corporation,**

a Texas corporation,

Tenant

January _8_, 2002




## TABLE OF CONTENTS

ARTICLE 1     VARIABLE INFORMATION ...................................................................1
1.1     Landlord.....................................................................................................1
1.1.1     Name.............................................................................................1
1.1.2     Address.........................................................................................1
1.2     Tenant........................................................................................................1
1.2.1     Name.............................................................................................1
1.2.2     Address.........................................................................................1
1.3     Lease Execution Date.................................................................................1
1.4     Name and Location of Property...................................................................1
1.4.1     Name.............................................................................................1
1.4.2     Address.........................................................................................1
1.5     Description of Premises..............................................................................1
1.5.1     Rentable Square Footage..............................................................1
1.5.2     Tenant's Proportionate Share.........................................................1
1.6     Initial Lease Term.......................................................................................1
1.7     Options.......................................................................................................1
1.8     Commencement Date..................................................................................1
1.9     Rent............................................................................................................2
1.9.1     Base Rent......................................................................................2
1.9.2     Percentage Rent............................................................................2
1.10     Security Deposit.......................................................................................2
1.11     Permitted Uses.........................................................................................2
1.12     Sign..........................................................................................................2
1.12.1     Area of Pylon Sign......................................................................2
1.12.2     Position on Pylon Sign................................................................2
1.12.3     Area of Building Sign..................................................................2
1.13     Substantial Completion Date for Landlord's Work.....................................2
1.14     Anticipated Substantial Completion Date..................................................2
1.15     Tenant Construction Allowance.................................................................2
ARTICLE 2     PREMISES ...............................................................................................2
2.1     Premises.....................................................................................................2
ARTICLE 3     TERM .......................................................................................................3
3.1     Term...........................................................................................................3
3.2     Options.......................................................................................................3
ARTICLE 4     RENT .......................................................................................................3
4.1     Security Deposit.........................................................................................3
4.2     Base Rent....................................................................................................3
4.3     Additional Rent...........................................................................................3
4.3.1     Building Operating Expenses.........................................................4
4.4     Estimated Monthly Payments of Additional Rent.........................................5

i

4.5     Landlord Books and Records. ...................................................................................5
4.6     Tenant Books and Records. .......................................................................................5
    4.6.1     Annual Financial Statements. ...................................................................5
    4.6.2     Continuous Operation .............................................................................5
ARTICLE 5      ALTERATIONS. ..........................................................................................6
ARTICLE 6      COVENANT AGAINST LIENS. ..................................................................6
ARTICLE 7      DAMAGE OR DESTRUCTION BY FIRE OR CASUALTY ......................6
7.1     Restoration. ...............................................................................................................6
7.2     Last Two Years. .........................................................................................................6
7.3     Rent Abatement. ........................................................................................................7
7.4     Failure to Restore. .....................................................................................................7
ARTICLE 8      INSURANCE. ...............................................................................................7
8.1     Fire and Other Casualty. ...........................................................................................7
    8.1.1     Property. ...................................................................................................7
    8.1.2     Self Insurance. .........................................................................................7
    8.1.3     Waiver. .....................................................................................................7
8.2     Liability. ....................................................................................................................7
8.3     Premium Increases Attributable to Tenant. ..............................................................8
8.4     Landlord's Rights to Procure Insurance. ...................................................................8
8.5     Waiver of Subrogation. .............................................................................................8
8.6     Plate Glass Insurance. ...............................................................................................8
8.7     Dram Shop Insurance. ...............................................................................................8
8.8     Certification of Insurance. .........................................................................................8
ARTICLE 9      USE; QUIET ENJOYMENT .......................................................................8
9.1     Tenant's Use. .............................................................................................................8
9.2     Use Restrictions. .......................................................................................................9
    9.2.1     Loading and Unloading of Goods. ...........................................................9
    9.2.2     Refuse Disposal. ......................................................................................9
    9.2.3     External Audio. ........................................................................................9
    9.2.4     Living Space. ...........................................................................................9
    9.2.5     Tenant's Permits / Licenses. ....................................................................9
    9.2.6     Alcoholic Liquors. ...................................................................................9
    9.2.7     Live Animals. ...........................................................................................9
    9.2.8     Employee Parking. ...................................................................................9
9.3     Quiet Enjoyment. ......................................................................................................9
ARTICLE 10      UTILITIES. .................................................................................................9
10.1     Water. ....................................................................................................................10
10.2     Electricity. .............................................................................................................10
10.3     Failure or Delay of Service. ..................................................................................10
10.4     Utility Access. .......................................................................................................10
10.5     Utility Measurement. .............................................................................................10
ARTICLE 11      MAINTENANCE AND REPAIRS; RIGHTS TO ENTER .......................10

| | | |
|---|---|---|
| 11.1 | Tenant's Duty. | 10 |
| 11.2 | Landlord's Right to Enter. | 10 |
| 11.3 | Structural Repairs. | 11 |
| 11.4 | Interest. | 11 |
| ARTICLE 12 | CONDEMNATION | 11 |
| 12.1 | All or Part of Premises or Building. | 11 |
| 12.2 | Rent Apportioned. | 11 |
| 12.3 | Partial Taking Without Termination. | 11 |
| ARTICLE 13 | DEFAULT AND LANDLORD REMEDIES | 12 |
| 13.1 | Tenant Default. | 12 |
| 13.2 | Remedies. | 12 |
| 13.2.1 | Lease Termination. | 12 |
| 13.2.2 | Termination of Tenant's Right to Possession. | 12 |
| 13.2.3 | Legal Enforcement. | 12 |
| 13.3 | Attorney Fees. | 13 |
| 13.4 | Bankruptcy. | 13 |
| 13.5 | Landlord Default. | 13 |
| 13.6 | Waiver of Damages and Limitation of Recourse. | 14 |
| ARTICLE 14 | SURRENDER OF POSSESSION | 14 |
| 14.1 | Tenant's Duty. | 14 |
| 14.1.1 | Removal of Trade Fixtures. | 14 |
| 14.1.2 | Surrender of Possession. | 14 |
| 14.2 | Landlord's Rights. | 14 |
| 14.2.1 | Transfer of Title to Tenant's Trade Fixtures. | 14 |
| 14.2.2 | Disposal of Tenant's Trade Fixtures. | 14 |
| ARTICLE 15 | HOLDING OVER. | 14 |
| ARTICLE 16 | NON-DISTURBANCE AND ATTORNMENT | 15 |
| 16.1 | Non-disturbance. | 15 |
| 16.2 | Attornment. | 15 |
| 16.3 | Mortgagee's Obligations. | 15 |
| 16.4 | Binding Effect. | 15 |
| 16.5 | Subordination. | 15 |
| 16.6 | Ground Lease. | 15 |
| ARTICLE 17 | ESTOPPEL | 15 |
| ARTICLE 18 | COMPLIANCE WITH LAWS | 15 |
| 18.1 | Compliance. | 15 |
| 18.2 | Hazardous Or Toxic Materials. | 16 |
| 18.2.1 | Asbestos. | 16 |
| 18.2.2 | Allowable Use Of Certain Hazardous Materials. | 16 |
| 18.2.3 | Definition Of Hazardous Materials. | 16 |
| 18.2.4 | Covenants. | 16 |
| 18.2.5 | Indemnification. | 17 |

ARTICLE 19     CERTAIN RIGHTS RESERVED BY LANDLORD ................................................17
   19.1     Showing Premises. ................................................17
   19.2     Approval of Certain Fixtures. ................................................17
ARTICLE 20     RULES AND REGULATIONS ................................................17
ARTICLE 21     ASSIGNMENT AND SUBLETTING ................................................17
ARTICLE 22     NOTICE ................................................18
ARTICLE 23     CONVEYANCE BY LANDLORD ................................................18
ARTICLE 24     RECORDING ................................................18
ARTICLE 25     SIGNAGE ................................................18
   25.1     Exterior Pylon Sign. ................................................18
   25.2     Exterior Wall Sign. ................................................18
   25.3     Signs. ................................................18
ARTICLE 26     INDEMNIFICATION ................................................18
   26.1     Landlord's Indemnification. ................................................18
   26.2     Tenant's Indemnification. ................................................19
ARTICLE 27     CONSTRUCTION ................................................19
   27.1     Landlord's Work. ................................................19
      27.1.1     Tenant Delay. ................................................19
      27.1.2     Force Majeure Delay. ................................................19
   27.2     Tenant Approval. ................................................19
   27.3     Accepting Possession. ................................................19
   27.4     Tenant's Work. ................................................20
      27.4.1     Tenant's Allowance. ................................................20
      27.4.2     Tenant's Architect and Contractors. ................................................20
      27.4.3     Tenant's Workmanship. ................................................20
      27.4.4     Tenant's Additions and Improvements. ................................................20
      27.4.5     Unions. ................................................20
      27.4.6     Tenant Permits. ................................................20
ARTICLE 28     MISCELLANEOUS ................................................20
   28.1     Binding Effect. ................................................20
   28.2     Illinois Law Governs. ................................................20
   28.3     Headings. ................................................20
   28.4     Severability. ................................................21
   28.5     Relationship of Parties. ................................................21
   28.6     Rent. ................................................21
   28.7     Consents and Waivers. ................................................21
   28.8     Remedies Cumulative. ................................................21
   28.9     Delay. ................................................21
   28.10     Submission of Lease. ................................................21
   28.11     Context. ................................................21
   28.12     Brokerage. ................................................21
   28.13     Authorship. ................................................21

EXHIBIT TABLE OF CONTENTS ................................................................................... 1

EXHIBIT A ................................................................................................................. 1

EXHIBIT B ................................................................................................................. 1

EXHIBIT C ................................................................................................................. 1

EXHIBIT D ................................................................................................................. 1

EXHIBIT E ................................................................................................................. 1

EXHIBIT F ................................................................................................................. 1

<u>SHOPPING CENTER LEASE</u>

## ARTICLE 1    VARIABLE INFORMATION

1.1    <u>Landlord.</u>

    1.1.1    <u>Name.</u>

        Sunil DeKalb, L.L.C., an Illinois limited liability company

    1.1.2    <u>Address.</u>

        c/o First Rockford Group, Inc.

        6801 Spring Creek Rd.

        Rockford, IL 61114

1.2    <u>Tenant.</u>

    1.2.1    <u>Name.</u>

        Mattress Giant Corporation, a Texas corporation

    1.2.2    <u>Address.</u>

        14665 Midway Road, Suite 100

        Addison, TX 75001

1.3    <u>Lease Execution Date.</u>

January ___8___, 2002

1.4    <u>Name and Location of Property.</u>

    1.4.1    <u>Name.</u>

        Approximate 33,500 square foot outlot at DeKalb County Shopping Center, DeKalb, IL

    1.4.2    <u>Address.</u>

        XXX Sycamore Rd.

        {To be inserted when made available by the City}

        DeKalb, IL  60115

1.5    <u>Description of Premises.</u>

    1.5.1    <u>Rentable Square Footage.</u>

        5,000 square feet

    1.5.2    <u>Tenant's Proportionate Share.</u>

        100% with respect to the Premises, and approximately 5,000/97,000 with respect to expenses in common with the Property.  The proportionate share with respect to expenses in common with the Property shall be recalculated from time-to-time in accordance with the provisions of Section 2.1

1.6    <u>Initial Lease Term.</u>

10 years.

1.7    <u>Options.</u>

A single five (5) year option.

1.8    <u>Commencement Date.</u>

The first to occur of: (a) seventy-five (75) days after the completion of Landlord's Work as defined in Section 27.1; provided, Tenant has all necessary permits to undertake Tenant's Work as of the date of Substantial Completion of Landlord's Work or failed to obtain them as a result of its breach of Section 27.4.6; (b) ninety (90) days after the completion of Landlord's Work as defined in

1

Section 27.1 without regard to when Tenant receives its permits to undertake Tenant Work; or (c) the date Tenant opens for business in the Premises.

1.9     Rent.

1.9.1     Base Rent.

| Lease Year | Yearly Rent | Monthly Rent | Cost / Sq. Ft. |
|---|---|---|---|
| 1 – 5 | $115,000 | $9,583.33 | $23.00 |
| 6 – 10 | $128,800 | $10,733.33 | $25.76 |
| Option  11 – 15 | $144,250 | $12,020.83 | $28.85 |

1.9.2     Percentage Rent.

None.

1.10     Security Deposit.

None.

1.11     Permitted Uses.

Sale of mattresses, box springs, bed headboards, brass bedpieces, bedroom furniture, and related items, subject to other permitted uses, including, but not limited to, Pier One's exclusive and the potential uses of other center tenants previously granted "all lawful uses."

1.12     Sign.

1.12.1     Area of Pylon Sign.

Maximum allowable by local municipality without variance.

1.12.2     Position on Pylon Sign.

Exclusive sign.

1.12.3     Area of Building Sign.

Maximum allowable by local municipality without variance.

1.13     Substantial Completion Date for Landlord's Work.

Projected to be June 30, 2002.

1.14     Anticipated Substantial Completion Date.

That date which is after March 1, 2002, and at least sixty (60) days following a Notice given by Landlord to Tenant that estimates the date for Substantial Completion, which date may be subject to Tenant Delay and Force Majeure Delay but shall nevertheless be binding for purposes of Sections 27.4.6 and 1.8.

1.15     Tenant Construction Allowance.

$25.00 per Rentable Square Foot, or a total of $125,000.00.

## ARTICLE 2     PREMISES

2.1     Premises.

Subject in all cases to the terms of that certain Ground Lease ("Ground Lease") dated August 31, 2000, between the County of DeKalb as a landlord ("Ground Lessor") and Landlord, said document having been recorded March 13, 2001, as Document Number 2001003661 in the office of the DeKalb County Recorder, as amended by First Amendment to Lease between the same parties dated April 11, 2001, and recorded April 12, 2001, as Document Number 2001005549 in the office of the DeKalb County

Recorder, and the other documents and matters referred to in Exhibit "A," attached hereto and made a part hereof, Landlord hereby grants and demises to Tenant, and Tenant hereby leases and rents from Landlord, upon and subject to the terms, conditions, covenants and provisions hereof, all that certain land, containing approximately .769 acres, ("Premises"), legally described in Exhibit "B," upon which Landlord is to construct a shell to be finished by Tenant as a building ("Building"), located in the DeKalb County Shopping Center, DeKalb, Illinois ("Property"), legally described on Exhibit "C," together with any and all improvements, appurtenances, rights, privileges, and easements benefiting, belonging or pertaining thereto. Landlord reserves the right to maintain, repair, and replace utility lines under, over, upon or through the Premises as may be reasonably necessary or advisable to service the Premises or the Property. As used in this Lease, "rentable square feet" ("RSF") shall be defined as the number of square feet of any building as certified by the Building Architect measuring to the outside of exterior demising walls and the middle of interior demising walls. Tenant's Proportional Share ("Tenant's Proportional Share") is established pursuant to the provision of Section 1.5.2 hereof and equals a fraction, the numerator of which is the RSF of the Building and denominator of which is the RSF of all buildings located on the Property with respect to expenses in common with the Property and 100% with respect to expenses allocated exclusively to the Premises. Without limiting the foregoing, in the event any other lease of the Property requires real estate taxes separately assessed to the Premises to be allocated exclusively to the Premises, then said taxes shall be so allocated. In no event shall the calculation of the appropriate Tenant's Proportional Share cause the same expense to be charged twice to Tenant, once as an expense allocated exclusively to the Premises and once allocated over the entire Property.

## ARTICLE 3     TERM

### 3.1     Term.

This Lease shall become effective upon its execution by authorized representatives of the parties. The term (the "Term") of this Lease shall commence and Base Rent and Additional Rent shall become payable upon the earlier of: (1) the date Tenant begins its business operations, or (2) as otherwise set out in Section 1.8 ("Commencement Date") and shall continue thereafter to and including the last day of the number of Lease Years set out in Section 1.6 measured from the first day of the first month immediately following the Commencement Date; provided, however, that if the Commencement Date is the first day of a month, such term shall continue thereafter to and including the date which is the aforesaid number of years from the Commencement Date. The term "Lease Year" means a period of twelve (12) consecutive calendar months.

### 3.2     Options

Tenant shall have the right to renew this Lease for the number of renewal terms, and with such other modifications as set out in Sections 1.7 and 1.9.1, commencing at the expiration of the prior term, such right to be exercised by, and only by, giving landlord written Notice as set forth herein of such renewal not less than one hundred eighty (180) days before the date on which such renewal term is to commence, provided however, that at Landlord's option such renewal shall not be effective if a default beyond all applicable cure periods of the Lease exists at the time such right to renew this Lease is exercised or at the end of the prior term. During any renewal term, the term and conditions of this Lease shall apply, except that there shall be no additional right to renew.

## ARTICLE 4     RENT

### 4.1     Security Deposit.

[Omitted Intentionally]

### 4.2     Base Rent.

Tenant shall pay to Landlord at the office of Landlord as set forth in Section 1.1 or such other place or places as Landlord may designate in writing from time to time, annual base rent ("Base Rent"), in twelve (12) equal monthly installments, each in advance as of the first day of each and every calendar month during the Term, the rent set out in Section 1.9.1. If the Term commences on a day other than the first day of a calendar month or ends on a day of a calendar month other than the last day of a calendar month, Base Rent for such fractional month shall be prorated on the basis of one-thirtieth (1/30) of the monthly Base Rent for each day of such fractional month, and for each such fractional month within the Term. Base Rent shall be payable without any prior demand therefore and without any deduction or setoff whatsoever except as provided herein.

### 4.3     Additional Rent.

Except as herein provided in this Lease, it is agreed that Tenant will pay Landlord, in addition to Base Rent, the following described amounts as additional rent under this Lease ("Additional Rent"). Except as otherwise expressly provided herein, payments of Additional Rent shall be pro-rated to account for the beginning and termination of the Term, and shall be payable without any deduction or set-off whatsoever. Base Rent and Additional Rent are sometimes referred to herein as "Rent".

**4.3.1    Building Operating Expenses.**

Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share as defined in Section 1.5.2 and 2.1 of the total "Operating Expenses" (as hereinafter defined) for any calendar year, all or part of which falls within the Term of this Lease.

The term "Operating Expenses" shall mean and include any and all reasonable out of pocket costs and expenses (including employee wages and reasonable overhead and burden thereon except as prohibited by Section 4.3.1 (1) - (5) hereof), paid or incurred by or on behalf of the Landlord in connection with the ownership, management, maintenance, or operation of any building, Premises, and the Property and all personal property in connection therewith, including, without limitation, the cost of security and security devices and systems, if any; snow, ice, and trash removal; cleaning and sweeping of common areas; exterior and interior landscaping and replacements; paving, including repair or replacement and parking lot striping; maintenance, repair and replacement of all utility systems; electricity, water, sewer, heating, lighting, and air conditioning for the common areas of the Premises and Property; window cleaning; insurance, including, but not limited to, fire, extended coverage, all risk, and/or liability, including a pro rata portion of any master policies; painting of any building exterior and common areas; repair and replacement of the roof and roof drainage systems; management and/or administrative fees of Landlord or third parties not to exceed 15%; scavenger services; building supplies; charges of any independent contractor who, under contract with the Landlord or its representatives, does any of the work of operating, maintaining, or repairing of any building, the Premises, and the Property; all Real Estate Taxes, as hereinafter defined, to any building, the Premises, and the Property; provided however, that Landlord reserves the right to collect estimated Real Estate Taxes in level monthly installments; and all other reasonable costs, charges, and expenses of whatsoever kind and nature, whether or not herein before mentioned, which, in accordance with generally accepted accounting principles, would be considered an expense of owning, managing, operating, maintaining, or repairing any building, the Premises, and the Property.

"Real Estate Taxes" shall include all taxes attributable to the improvements now or hereafter made to or upon any building, the Property, or the Premises, or attributable to any present or future installation in or on any building, the Property or the Premises, fixtures, machinery, or equipment; all real estate taxes, assessments, or impositions; water and sewer rents; and other governmental impositions and charges of every kind in nature whatsoever, nonrecurring as well as recurring; special or extraordinary as well as ordinary; foreseen and unforeseen; and each and every installment thereof, which are levied, assessed or imposed, or become due and payable or become liens upon, or arise in connection with the use, occupancy or possession of, or any interest in, any building, the Property, or the Premises, or any underlying land, building or other improvement thereon, or any part thereof, during the Term. If because of any change in the taxation of real estate, any other tax, imposition or assessment (including without limitation, any franchise, income, profit, sales, use, occupancy, gross receipts or rental tax) is imposed on Landlord as the owner of any building, the Property, or the Premises, or on the occupancy, rents or income from either of the foregoing, in substitution for any taxes, such other tax or assessment will be deemed part of Real Estate Taxes.

In the event annual Real Estate Taxes are eliminated in whole or part, or decreased (except for decreases resulting from a challenge of the assessed valuation of any building, the Property, and/or the Premises in the normal course of business) at any time during the Term, Tenant shall pay Landlord, in substitution of Real Estate Taxes as Additional Rent, an annual amount ("Substitute Taxes") equal to its Proportionate Share of the amount of Real Estate Taxes paid at the then current level through the balance of the Term. Substitute Taxes shall increase at a five percent annual rate throughout the Term. Tenant's Proportionate Share of Substitute Taxes shall be paid by Tenant to Landlord in the manner provided for payment of Real Estate Taxes until such time, if any, that the current annual Real Estate Taxes exceed the Substitute Taxes, in which case Tenant shall pay Landlord the Real Estate Taxes as provided for herein.

Notwithstanding the foregoing, the following shall not be included within the definition of Operating Expenses:

(1)    interest and principal payments on mortgage debt;

(2)    the costs of correcting latent defects and defects in construction of any building or its systems, except that conditions not occasioned by construction defects resulting from ordinary wear and tear will not be deemed defects for the purpose of this category;

(3)    legal expenses incurred in connection with tenant leases including, without limitation, negotiations with prospective tenants and enforcing provisions of this Lease or other leases in any building;

(4)    real estate brokerage and leasing commissions; and

(5)    any costs allocated to the Landlord under Section 11.3 for structural repairs.

Landlord shall timely arrange for all services required for the management, operation, and maintenance of any building, parking lot, and other improvements, it being understood that the project shall at all times throughout the Term of this



Lease be managed as a quality facility consistent with standards prevailing in the municipality in which the Building is located. Notwithstanding anything herein to the contrary, Tenant shall independently contract for and pay for all janitorial and scavenger services required by Tenant with respect to the Premises.

Notwithstanding the foregoing, any measurable increase of a material magnitude of Operating Expenses attributable to Tenant's nature of business or hours of operation shall be identified and paid solely by Tenant.

**4.4    Estimated Monthly Payments of Additional Rent.**

Tenant shall pay Landlord, on or before the first day of each calendar month during the Term, one-twelfth (1/12th) of Tenant's Proportionate Share of Operating Expenses for the current calendar year as estimated by Landlord from time to time. Said monthly payments shall be based upon reasonable cost projections of Landlord (a copy of which projections shall be furnished to Tenant upon request therefor), subject to Landlord's absolute right to increase from time to time such monthly payment whenever such payments, in Landlord's reasonable estimation, will not be sufficient to cover Tenant's Proportionate Share.

Within one hundred twenty (120) days following the end of each calendar year, Landlord shall furnish Tenant with a written statement confirming Tenant's Proportionate Share of Operating Expenses. If the estimated payments by Tenant total less than the actual amount of Tenant's Proportionate Share for such calendar year, then Tenant shall pay the amount of such deficiency to Landlord within ten (10) days of Tenant's receipt of such written statement. If the estimated payments by Tenant exceed the actual amount of Tenant's Proportionate Share, such excess shall be credited against the payments of Additional Rent next due hereunder, or if no payments are remaining due to the expiration of the Term, the same shall be refunded to Tenant by Landlord within thirty (30) days of issuance of Landlord's written statement. Landlord's and Tenant's obligation hereunder shall survive the expiration of this Lease.

**4.5    Landlord Books and Records.**

Landlord agrees to keep books and records for Operating Expenses in accordance with generally accepted accounting principles appropriate to the management of properties of this type. Provided Tenant is not in default of any terms of this Lease, Tenant shall have the right, no more than once with respect to any calendar year during the Term of this Lease, no later than two (2) years following the end of any such calendar year, to audit the pertinent books and records of Landlord with respect to the calculation of Operating Expenses. Landlord shall have no obligation to retain books and records with respect to Operating Expenses for any calendar year, for more than two (2) years following the end of any calendar year during and after the Term. All expenses of such audit shall be borne by Tenant. Tenant shall not employ any person or entity to conduct any such audit on a contingent fee basis. No subtenant shall have any right to conduct an audit and no assignee shall conduct an audit for any period during which such assignee was not in possession of the Premises. Accordingly, Tenant's Proportionate Share of Operating Expenses shall be adjusted based on such audit and the appropriate rebate or additional charge made to Tenant. If the audit reveals an error in favor of Tenant greater or equal to five percent (5%) of Tenant's Proportionate Share of the amount audited, then the reasonable cost of the audit shall be paid by Landlord. In the event Tenant fails to request an audit within two (2) years following the end of any calendar year, then Tenant's right to audit Landlord's books and records related to Operating Expenses for the year in question shall be deemed waived and Landlord's written statement shall be deemed final and accepted by Tenant.

**4.6    Tenant Books and Records.**

**4.6.1    Annual Financial Statements.**

At the anniversary of each Lease Year, Tenant shall provide Landlord with its unaudited income and balance sheets for the preceding calendar year. Should Landlord require Tenant's income and balance sheets for a refinance or to market the Property for sale, it shall give reasonable Notice thereof to Tenant. Tenant shall provide Landlord within seven (7) days of receipt of said Notice with such audited income and balance sheets as shall then exist for the most recent two full years. The statements provided in response to Landlord's request shall be audited and prepared in accordance with generally accepted accounting practices, consistently applied.

**4.6.2    Continuous Operation**

Tenant agrees that it will keep its place of business in the center open continuously during the term of this Lease, on such days and for such hours as shall be compatible with major stores in said center, and will not cease operations in said Premises without the express consent of the Landlord, unless prevented from doing business therein by reason of applicable ordinances or other acts of governmental authorities; or by acts of God, or conditions beyond the control of Tenant; in all cases excluding a reasonable period of remodeling (which shall in no event exceed 90 days) and a single period not to exceed thirty (30) consecutive days during any Term unrelated to remodeling, casualty or condemnation.

## ARTICLE 5    ALTERATIONS

All construction work to be done on the Premises by or for the benefit of Tenant shall conform with the provisions of Sections 6.6 – 6.9 of the Ground Lease, and, in connection therewith, Tenant agrees to supply to Landlord any information or documents that Landlord is required to furnish to Ground Lessor under the terms of the Ground Lease. Tenant shall not, without the prior written consent of Landlord which shall not be unreasonably withheld or delayed, make any material alterations, installations, improvements, or additions to the Premises including, but not limited to, wall coverings, floor coverings, and special lighting installation. This limitation shall not apply to any re-painting of the Premises undertaken by Tenant during the Term of this Lease. In the event Tenant desires to make any material alterations, installments, improvements, or additions, Tenant shall first submit to Landlord plans and specifications therefor, including names of proposed design professionals and contractors to be involved in such work, and obtain Landlord's written approval thereof (which shall not be unreasonably withheld or delayed) prior to commencing any such work. Such plans shall be deemed approved unless Landlord shall furnish to Tenant written objections to such plans within twenty (20) days after the plans are received by Landlord. All such work shall be done at Tenant's sole cost and expense, and in a good and workmanlike manner. Landlord shall be furnished with sworn statements and waivers of lien as may be deemed appropriate by Landlord. Subject to Sections 5.2 and 5.3 of the Ground Lease, except as to any trade fixtures, business equipment, or other removable personal property installed by Tenant, which Tenant shall remove at the termination of this Lease (by lapse of time or otherwise) and for which Tenant shall repair all improvements damaged by the installation or removal of same, all alterations, installations, improvements, and additions (whether temporary or permanent in character) made by Tenant in or upon the Premises shall be the property of Tenant, but shall become Landlord's property and shall remain upon the Premises at the termination of this Lease, by lapse of time or otherwise, without compensation to Tenant. All construction work performed at Tenant's request in the Premises shall be done by contractors and subcontracts who have worker's compensation and employer's liability insurance meeting the following requirements: (1) in statutory amounts; (2) with reputable companies qualified to do business in the State of Illinois; and (3) showing Landlord and Landlord's lender or lenders as additional insureds. In addition, all such contractors and subcontractors shall have general public liability insurance coverage consistent with the specifications contained in Sections 8.2 and 8.5 of this Lease.

## ARTICLE 6    COVENANT AGAINST LIENS

Nothing contained in this Lease shall authorize Tenant to do any act which shall in any way encumber Landlord's title to any building, the Property, or the Premises, nor in any way subject Landlord's title to any claims by way of lien or encumbrance whether claimed by operation of law or by virtue of any expressed or implied contract of Tenant, and any claim to a lien upon any building, the Property, or the Premises arising from any act or omission of Tenant shall attach only against Tenant's interest and shall in all respects be subordinate to Landlord's title to any building, the Property, or the Premises. If Tenant has not removed any such lien or encumbrance, or furnished Landlord reasonably sufficient bond therefor, within thirty (30) days after written notice to Tenant by Landlord, Landlord may pay the amount without being responsible for making any investigation as to the validity thereof, and the amount so paid shall be additional to Rent due and payable forthwith together with interest at the rate of twelve (12%) percent per annum as Additional Rent.

## ARTICLE 7    DAMAGE OR DESTRUCTION BY FIRE OR CASUALTY

**7.1    Restoration.**

Except as set out in Section 7.2, if the Premises are damaged or destroyed by fire or other casualty, Landlord shall, at its expense, and subject to Landlord's mortgagee(s) making available insurance proceeds to fund the same, repair and restore said Premises so as to be substantially the same as prior to such damage or destruction. Landlord shall begin such repairs or restoration within ninety (90) days from the date of such fire or other casualty and shall complete said repairs or restoration within six (6) months from the date Landlord receives insurance proceeds and such permits as might be required for construction, said period being subject to any delay caused by any Force Majeure Delay. Landlord shall notify Tenant in writing of the date by which repairs to or replacement of the Building is to commence, and the estimated date of completion, and shall diligently pursue such repairs or restoration to final completion. The date by which Landlord is to begin and complete said repairs or restoration shall be deferred for a period equal to any delay caused by reason of labor controversy, act of God, fire, or other casualty, governmental regulations, insurance adjustment, failure of Landlord's mortgagee(s) to authorize the release of insurance proceeds for funding the repairs or restoration, or other cause beyond the reasonable control of Landlord, provided Landlord has from time to time in writing kept Tenant fully advised of such delays and the cause therefor.

**7.2    Last Two Years.**

If the Premises are damaged or destroyed by fire or other casualty during the last two (2) lease years and the cost of repairing or restoring said Premises as required by Section 7.2 herein will exceed twice the Base Rent per lease year, then Landlord shall have the option to terminate this Lease without fault on thirty (30) days notice to Tenant to be given within sixty (60) days of the casualty, unless Tenant shall exercise its renewal option in which event Landlord shall restore the Premises as set forth in Section 7.1.

**7.3    Rent Abatement.**

If such damage or destruction to the Premises results in the complete suspension of business in the Premises, all rents and other charges payable by Tenant hereunder shall abate from the date of such suspension of business until the completion of said repairs or restoration; and if such damage or destruction or the work of repairing or restoring said improvements results in only a partial suspension of business, the abatement shall be apportioned accordingly on the basis of the floor area rendered untenantable.

**7.4    Failure to Restore.**

If Landlord fails to begin or complete the repairs or restoration of the Building or the Premises, within the times and in the manner provided for in this ARTICLE 7, and, if twenty percent (20%) or more of the sales floor of the Premises is both damaged and not being used by Tenant to conduct sales, then Tenant may either: (a) Terminate the Lease by notice in writing to Landlord at any time prior to said beginning or completion, as the case may be; or (b) Abate rent ratably for the square footage so damaged and not used as against the entire square footage provided for in the Lease.

## ARTICLE 8    INSURANCE

**8.1    Fire and Other Casualty.**

    **8.1.1    Property.**

Landlord agrees to purchase and keep in force and effect 100% replacement value insurance on all buildings located on the Property, including, but not limited to, coverage against fire, vandalism and malicious mischief, and perils covered on an "all risk" or "special form" basis, as such coverage is from time to time available, which policy shall contain a clause pursuant to which the insurance carrier waives all rights of subrogation against the Tenant with respect to losses payable under such policy. Landlord may, in its sole discretion, purchase rent or rental value insurance, in amounts reasonably determined by Landlord, against loss of rent due to fire or other casualties, including an extended coverage endorsement and other endorsements.

    **8.1.2    Self Insurance.**

Such Landlord's insurance shall be subject to reasonable levels of self insurance by Landlord, the deductible of which shall not exceed $10,000, without Tenant's written approval, shall name the Tenant as an additional insured as its interests may appear, and shall contain a replacement cost endorsement.

    **8.1.3    Waiver.**

Except for Landlord's negligent or willful acts, Tenant waives any claim(s) against Landlord related to damage to Tenant's improvements and to Tenant's merchandise, contents, furniture, equipment, files, and all other personal property located on the Premises (collectively referred to herein as "Tenant's Property"), including, but not limited to, claims arising from vandalism, malicious mischief, perils covered by extended coverage, theft, sprinkler leakage, water damage (however caused), explosion, malfunction, or failure of heating and cooling or other apparatus, and other similar risks. Landlord will not procure any insurance against damage to Tenant's Property. Tenant shall secure its own insurance coverage for Tenant's Property. If such insurance is procured, Landlord shall be named as an additional insured as its interests may appear.

**8.2    Liability.**

Tenant shall, at Tenant's sole cost and expense, maintain during the entire Term hereof, commercial general liability insurance and property damage insurance under policies issued by insurers having a Best's Insurance Reports rating of at least A/V, with a combined single limit of not less than $3,000,000 for personal injury, bodily injury, sickness, disease, or death or for damage or injury to or destruction of property (including the loss of use thereof) for any one occurrence. Such insurance shall be subject to reasonable levels of risk retention by Tenant as approved by the Landlord from time to time. Tenant's policies shall name as additional insureds, Landlord and any mortgagees as their interests may appear. Such policies shall provide by endorsement that the insurer is required to provide Landlord at least thirty (30) days written notice prior to any cancellation or termination of such insurance. Tenant shall provide Landlord an original of the required policy or certificate at least ten (10) days prior to the Commencement Date and thereafter on or before the first day of each Lease Year of the Term. The minimum limits of Tenant's comprehensive public liability policies of insurance shall be subject to increase from time to time during the Term, if either party believes in good faith that an increase is required for adequate protection.

Landlord agrees to purchase and keep in force and effect commercial general liability insurance and property damage insurance on all buildings, on the Property, the Premises, and the Property with like policy limits to those required of the Tenant.

Without limitation, the cost of all insurance procured by Landlord pursuant to this Section 8.2 shall be an Operating Expense and shall be borne by Tenant to the extent of Tenant's Proportionate Share thereof. Any increase in the premiums for insurance

maintained by Landlord in connection with the Building, Premises, or Property (whether or not required hereunder) which is attributable to Tenant's use of the Premises, may, at Landlord's option, be borne solely by Tenant.

**8.3    Premium Increases Attributable to Tenant.**

Any increase in the premiums for any insurance maintained by Landlord in connection with any building as the Property, the Premises, or the Property (whether or not required hereunder) which is attributable to Tenant's use of the Property, the Premises, or any building located on the Property, for unusual purposes or hours may be allocated by Landlord exclusively to Tenant.

**8.4    Landlord's Rights to Procure Insurance.**

In the event Tenant fails to provide any policy or policies of insurance as required hereunder, Landlord may, but shall not be required to, obtain such insurance and the amounts so paid shall be deemed reserved under this Lease due and payable forthwith in the full amount chargeable to Tenant as Additional Rent. This right is in addition to any other rights Landlord may have arising from a breach of Tenant's obligation hereunder to provide insurance. Any amount so advanced by Landlord shall bear interest at the rate of twelve (12%) percent per annum and shall be paid as Additional Rent.

**8.5    Waiver of Subrogation.**

Nothing in this Lease shall be construed so as to authorize or permit any insurer of Landlord or Tenant to be subrogated to any right of Landlord or Tenant against the other party arising under this Lease. Landlord and Tenant each hereby release the other to the extent of any perils to be insured against by either of the parties under the terms of this Lease, whether or not such insurance has actually been secured, and whether such insurance is through self-insurance or otherwise, and to the extent of their respective insurance coverage (whether such insurance is through self-insurance or otherwise) for any loss or damage caused by any such casualty, even if such incidents shall be brought about by the fault or negligence of either party or persons for whose acts or negligence the other party is responsible. All insurance policies to be provided under this ARTICLE 8 by either Landlord or Tenant shall contain a provision that they are not invalidated by the foregoing waiver. Such waiver shall, however, cease to be effective if the existence thereof precludes either Landlord or Tenant from obtaining any such policy.

**8.6    Plate Glass Insurance.**

Tenant shall keep and maintain in force during the term hereof, plate glass insurance upon windows and doors in the Building, which may be self-insurance.

**8.7    Dram Shop Insurance.**

In the event that at any time during the term of this Lease or any extension or renewal thereof, beer, wines, or other alcoholic liquors or beverages are sold or given away upon or from the Premises (it being understood and agreed, however, that the foregoing provision shall not authorize use of the Premises for such purposes without the express consent of the Landlord being set forth otherwise in this Lease), Tenant shall, at its sole expense, obtain, maintain and keep in force, adequate Dram Shop insurance protecting both Tenant and Landlord in connection therewith with policy limits covering the full amount of potential liability provided for from time to time under the laws of the state in which the property is located. Said policies shall be in such companies as are authorized to write such coverage in the state in which the property is located, shall be acceptable to Landlord and/or its lender (which shall be named as an additional insured) and copies shall be maintained on file with Landlord, and shall contain non-cancelable clauses unless Landlord is given at least thirty (30) days notice of such proposed cancellation. In the event Tenant shall fail to procure such insurance where applicable Landlord may procure the same and in the event Landlord shall be unable to procure the same (all at Tenant's expense) then sales of the foregoing products shall be suspended until such coverage is again in force. If Landlord does procure the same, the cost thereof, together with interest at the rate of twelve (12%) percent per annum shall be Additional Rent due immediately.

**8.8    Certification of Insurance.**

The parties shall provide each other evidence of the insurance policy or policies required by this ARTICLE 8 at least thirty (30) business days prior to the Commencement Date, and at least thirty (30) days prior to the expiration thereafter of any such policy.

**ARTICLE 9       USE; QUIET ENJOYMENT**

**9.1    Tenant's Use.**

The Premises shall be used solely for the uses set out at Section 1.11 and for no other purpose whatsoever. Tenant shall not use or permit upon the Premises anything that will invalidate any policy of insurance now or hereafter carried on the Building or that will increase the rate of insurance on the Building, Property, or Premises. Tenant shall not do anything or permit anything to be done upon the Premises which in any way may tend to create a nuisance, disturb any other tenants in the Building or the occupants of any neighboring property. Tenant shall comply with all governmental health and safety requirements and regulations respecting



the Building, Property, or Premises, and shall not conduct or permit to be conducted on the Building, Property, or Premises, any business which is in violation of any applicable law.

**9.2    Use Restrictions.**

Tenant, for itself, its employees, agents, servants, clients, customers, invitees, licensees, and guests, agrees to observe and comply at all times with the following rules and regulations as herein set forth. Without limitation, Tenant agrees that the uses set out in Exhibit D are prohibited. Tenant agrees to recognize the exclusives set out in Exhibit E, together with any exclusives granted by Landlord with respect to the balance of the Property after the date hereof that do not conflict with a permitted use of the Premises under the terms hereof to which Landlord provides written notice to Tenant.

**9.2.1    Loading and Unloading of Goods.**

All loading and unloading of goods shall be done only at such times, in the areas and through the entrances indicated on the Floor Plans for such purposes unless otherwise mutually agreed by the parties hereto. Loading and unloading operations shall be conducted as not to obstruct or hinder the operation of the businesses of the other tenants in the building, nor will Tenant unreasonably block or obstruct any street, sidewalk, or right-of-way adjacent to or comprising part of the Property.

**9.2.2    Refuse Disposal.**

Unless otherwise specified by Landlord, all refuse shall be prepared for collection by placing same in sealed plastic bags and depositing such bags at the collection site reasonably designated by Landlord.

**9.2.3    External Audio.**

No loudspeakers, television sets, radios, or other devices shall be used in a manner as to be heard or seen outside the Premises.

**9.2.4    Living Space.**

No person shall use the Premises as sleeping quarters, sleeping apartments, or lodging rooms.

**9.2.5    Tenant's Permits / Licenses.**

Tenant shall obtain and keep in force and effect all permits or licenses necessary or required to conduct its business.

**9.2.6    Alcoholic Liquors.**

Tenant shall not at any time manufacture, sell, use, or give away, and shall not at any time permit the manufacture, sale, use or distribution of any intoxicating or alcoholic liquors on the Premises without the express consent of the Landlord.

**9.2.7    Live Animals.**

No live animals other than fish in an aquarium, and "seeing-eye" dogs, shall be kept or displayed upon the Premises.

**9.2.8    Employee Parking.**

Tenant and its employees shall park their motor vehicles in such areas as Landlord shall from time to time designate as employee parking area. Upon request of the Landlord, Tenant will furnish to Landlord the licenses numbers of any automobiles belonging to Tenant and its employees. The area designated for employee parking is shown on Exhibit "H".

**9.3    Quiet Enjoyment.**

The Landlord agrees that the Tenant upon payment of the Rent hereunder and all other payments and charges to be paid by the Tenant under the terms of this Lease and upon observing and keeping the conditions and covenants of this Lease on the part of the Tenant to be observed and kept, shall lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease free from any hindrance by Landlord, subject to the provisions of this Lease. Landlord will use reasonable efforts to abate third party acts which disturb Tenant's quiet enjoyment.

**ARTICLE 10    UTILITIES**

Landlord shall furnish the following services:

9

**10.1    Water.**

Domestic water, either separately or in common with other tenants from municipal drinking, lavatory, and toilet purposes from regular Building supply. Tenant shall pay the cost of all separately metered water furnished for any purpose within the Premises, and common metered utilities to be an Operating Expense. Tenant shall not waste or permit the waste of water.

**10.2    Electricity.**

Electricity shall not be furnished by the Landlord, but shall be furnished by Commonwealth Edison Company or another approved electric utility company serving the area. Landlord shall permit Tenant to receive such service direct from such utility company at Tenant's cost. Tenant shall make all necessary arrangements with the utility company for paying for electric current furnished by it to Tenant, and Tenant shall pay for all charges for electric current consumed on the Premise during Tenant's occupancy thereof, and common metered utilities to be an Operating Expense. Tenant shall make no material alterations or additions to the electric equipment or appliances without the prior written consent of the Landlord in each instance which consent shall not be unreasonably withheld or delayed. Tenant also agrees to purchase its own lamps, bulbs, ballasts, and starters used in the Premises during the Term hereof, provided that Tenant can buy them from Landlord at Landlord's cost. Tenant covenants and agrees that at all times its use of electric current shall never exceed the capacity of the feeders to the Building or the risers or wiring installed thereon.

**10.3    Failure or Delay of Service.**

Tenant agrees that Landlord shall not be liable in damages, by abatement of Rent or otherwise, for failure to furnish or delay in furnishing any service when such a failure or delay is occasioned in whole or in part, by repairs, renewals, improvements by Landlord or its agents, by any strike, lockout, or other labor trouble, by inability to secure electricity, gas, water, or other fuel at the Building after reasonable effort (including Landlord's cooperation in restoration of service) to do so, by any accident or casualty whatsoever, by the act or default of Tenant or other parties, by failure of Landlord's bank(s) or mortgagee(s) to provide financing or to release insurance or construction proceeds, or by any cause beyond the reasonable control of Landlord; and any such failure or delay shall never by deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or to relieve Tenant from paying Rent or performing any of its obligations under this Lease.

**10.4    Utility Access.**

Tenant agrees to cooperate fully, at all times, with Landlord in abiding by all reasonable regulations and requirements which Landlord may prescribe for the proper functioning and protection of all utilities and services reasonably necessary for the operation of the Premises and the Building. Landlord, throughout the Term, shall have free access to any and all mechanical installations, and Tenant agrees that there shall be no construction or permanent partitions or other permanent obstructions which might interfere with the moving of the servicing equipment of Landlord to or from the enclosures containing said installations. Tenant further agrees that neither Tenant nor its employees, agents, licensees, invitees, or contractors shall at any time tamper with, adjust, or otherwise in any manner affect Landlord's mechanical installations. Notwithstanding the foregoing, Tenant may operate the mechanical equipment of the Premises consistent with the manufacturer's operating instructions.

**10.5    Utility Measurement.**

In the event that the use of any utilities serving the Premises are measured separately from the use of utilities for the Building, then the cost of such utilities shall be paid by Tenant directly to the service provider, and if in common, then the cost of such utilities shall be an Operating Expense.    Provided, however, that if there is any common utility service and Tenant's use is disproportionately large due its nature of business or hours of operation, Landlord may, but need not, equitably adjust for said usage in accordance with Section 4.3.1.

**ARTICLE 11    MAINTENANCE AND REPAIRS; RIGHTS TO ENTER**

**11.1    Tenant's Duty.**

Tenant shall, at its sole cost and expense, keep the interior and non-structural portions of the Premises in good repair and tenantable condition during the Term (except for casualties covered by the Building Insurance), and Tenant shall promptly, at its sole cost and expense, repair all damage to the Premises, Building, or the Property caused by the intentional act, gross negligence, or negligence of Tenant, its agents, servants, employees, guests and invitees, except for defects in original construction, latent defects, damage covered by Landlord's insurance or caused by the negligence or intentional act of Landlord, its agents, servants, employees, guests and invitees. Tenant shall, at Tenant's cost, be responsible for regular trash and refuse removal in connection with Tenant's use and occupancy of the Premises in compliance with all applicable laws and regulations.

**11.2    Landlord's Right to Enter.**

If Tenant does not act promptly as aforesaid, Landlord may, subject to prior notice to Tenant in situations other than emergencies, but shall not be required to, enter the Building, Property, or Premises at all reasonable times to make any repairs, alterations,

10

improvements, or additions, as Landlord shall desire or deem necessary for the safety, preservation, or improvement of the Building or the Property, or as Landlord may be required to do by any governmental authority or by the order or decree of any court or by any other proper authority. In the event Landlord or its agents or independent contractors shall elect or be required to make repairs, alterations, improvements, or additions to the Premises, Building, or the Property, Landlord shall be allowed to take into and upon the Premises, Building, or Property, all material that may be required to make such repairs, alterations, improvements, or additions and during the continuance of any of said work, to temporarily close doors, entry ways, public space, and corridors in the Premises, Building, or Property and to interrupt or temporarily suspend any services and facilities without being deemed or held guilty of an eviction of Tenant or for damages to any of Tenant's property, business, or person, and the Rent reserved herein shall in no way abate while said repairs, alterations, improvements, or additions are being made. Landlord shall minimize its obstruction of Tenant's business to the extent reasonably practical under the circumstances. Landlord may, at its option, make all such repairs, alterations, improvements, or additions in and about the Premises, Building, or Property during ordinary business hours, but if Tenant desires to have the same done at any other time, and the same can be practicably done at any other time, Tenant shall then pay all overtime and additional expenses resulting therefrom. No notice need be provided in the event of an emergency. Landlord will pay for or repair any damage to the Premises caused by any entry.

Landlord reserves the right at all reasonable times during the term of this Lease for Landlord or Landlord's agents to enter the Premises for the purpose of inspecting and examining the same, and to make such repairs, alterations, improvements, or additions as Landlord may deem necessary or desirable. Nothing herein contained, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility, or liability whatsoever for the care, maintenance, or repair of the building or any part thereof, except as otherwise herein specifically provided. Landlord shall retain the right to enter without notice in the event of and emergency.

**11.3**  **Structural Repairs.**

Landlord will repair all roof and roof drainage systems, and entrance doors in the Building, except for breakage caused by Tenant's negligence, and shall charge such repair as an Operating Expense. Landlord shall, at its expense, repair, reconstruct, or replace all exterior and structural damage (excluding broken windows, plate glass, and entrance doors which are agreed to be Building maintenance items) or structural defects in the exterior or bearing walls and floor of the Building or the Premises excluding any structural damage caused by the intentional act, gross negligence, or negligence of Tenant, its agents, servants employees, guests, and invitees. Landlord shall be responsible for the cost of any repairs required as a result of Landlord's, its agents', and contractors' negligence. Any contractors hired by Landlord to perform any repairs, alterations, improvements, or additions Landlord elects or is required to make hereunder shall have insurance in commercially reasonable amounts. All repairs Landlord elects or is required to make hereunder shall be made in a good and workmanlike manner.

**11.4**  **Interest.**

Any amount paid by Landlord for maintenance repairs or replacements which are the obligation of Tenant shall bear interest at the rate of twelve percent (12%) per annum, shall be due immediately, and shall be paid as Additional Rent.

### ARTICLE 12    CONDEMNATION

**12.1**  **All or Part of Premises or Building.**

If all or more than ten percent (10%) of the rentable square footage of the Premises or if the parking spaces such that fewer than those required by DeKalb City Code remain shall be taken or condemned by any competent authority for any public use or purpose, or sold to any such authority which has the power of eminent domain and has threatened to exercise such power with respect to the Premises, Building, or Property, then, unless otherwise agreed to by the parties, the Term, at Tenant's option, shall end sixty (60) days after the earlier of either: (1) the date of any court order or agreement approving such taking or condemnation; (2) the date Landlord receives Tenant's advance written notice that it intends to terminate possession of the Premises, provided Tenant vacates the Premises within such sixty (60) day period; or (3) the date such authority takes possession of the portion of the Property so condemned or sold. Landlord shall be entitled to any and all condemnation awards or judgments and Tenant hereby assigns such award or judgment to Landlord (except to extent such award or judgment specifically provides for payment thereof to Tenant for its relocation costs and Tenant improvements paid or other items specifically awarded to Tenant).

**12.2**  **Rent Apportioned.**

Rent shall, in all cases, be apportioned and paid as of the date of any of the above such terminations.

**12.3**  **Partial Taking Without Termination.**

In the event any portion of the Premises is taken and this Lease is not terminated in accordance with the provisions of this ARTICLE 12, all sums due under this Lease shall abate ratably as to the portion of the Premises so taken. Landlord, to the extent of the condemnation award or judgment, shall make any structural repairs or restoration necessary to make a complete architectural unit of the remainder of the Premises.

## ARTICLE 13    DEFAULT AND LANDLORD REMEDIES

**13.1**    **Tenant Default.**

If: (1) default shall be made in the payment of Base Rent, Additional Rent, or any installment thereof, or any other sum required to be paid by Tenant under this Lease or related to the occupancy of the Premises following written notice of default by Landlord and a ten (10) calendar day period to cure; (2) default shall be made in the performance of any of the other covenants or conditions of this Lease which Tenant is required to observe and perform and such default shall continue for thirty (30) calendar days after written notice to Tenant; provided, however, that if the nature of Tenant's obligation is such that more than thirty (30) calendar days are required for performance then Tenant shall not be in default if Tenant commences performance within such 30-day period and thereafter diligently prosecutes the same to completion; (3) the interest of Tenant in this Lease shall be levied upon under execution or other legal process, or if any petition for bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings, or other proceeding for relief under any bankruptcy or similar law for the relief of debtors, are either instituted by Tenant or against Tenant and are allowed against it or consented to by it or not dismissed within sixty (60) calendar days after such institution against Tenant; or (4) Tenant becomes insolvent or admits in writing its inability to pay its debts as they mature, or if any assignment of Tenant's property shall be made for the benefit of creditors, or if a receiver or trustee is appointed for Tenant or its property, (any of the foregoing events being herein referred to as a "Default"), then Landlord may treat the occurrence of any one or more of the foregoing events as a breach of this Lease by Tenant and thereupon at its option may, without further notice or demand of any kind to Tenant or any other person, have any one or more of the following described remedies in addition to all other rights and remedies provided at law or in equity.

**13.2**    **Remedies.**

If a Default occurs, Landlord shall have the rights and remedies hereinafter set forth, which shall be distinct, separate, and cumulative.

**13.2.1**    **Lease Termination.**

Landlord may terminate this Lease by giving to Tenant written notice of the Landlord's election to do so, in which event the Term of this Lease shall expire, and all right, title, and interest of Tenant shall expire on the date stated in such notice.

**13.2.2**    **Termination of Tenant's Right to Possession.**

Landlord may terminate the right of Tenant to possession of the Premises without terminating this Lease by giving notice to Tenant that Tenant's right of possession shall expire on the date stated in such notice, whereupon the right of Tenant to possession of the Premises or any part thereof shall cease on the date stated in such notice.

**13.2.3**    **Legal Enforcement.**

Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including, without limitation, injunctive relief and the recovery of all moneys due to become due from Tenant under any of the provisions of this Lease.

If Landlord exercises either of the remedies provided for in Subsections 13.2.1 and 13.2.2 herein above, Tenant shall surrender possession and vacate the Premises and immediately deliver possession thereof to the Landlord, and Landlord may re-enter and take complete and peaceful possession of the Premises. If Landlord terminates the right of Tenant to possession of the Premises without terminating this Lease, such termination of possession shall not release Tenant, in whole or in part, from any of Tenant's obligations to pay all Rent reserved hereunder for the full Term and Landlord shall have the right to pursue any and all available remedies against the Tenant. For the purpose of determining Rent in the event of a default, Percentage Rent for any period shall be the greater of: (1) the pro rata share of actual Percentage Rent for the applicable full Lease Year; or (2) the pro rata share of the Percentage Rent payable for the preceding full Lease Year. In addition, Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Rent and any other sums thereafter accruing as they become due under this Lease during the period from the date of such notice of termination of possession to the stated end of the Term. In addition, if the consideration collected by Landlord upon any such reletting, after payment of the expenses of reletting the Premises which have not been reimbursed by Tenant, is insufficient to pay monthly the full amount of the Rent, Tenant shall pay to Landlord the amount of each monthly deficiency as it becomes due.

Landlord shall use commercially reasonable efforts to relet the Premises or any part thereof for the account of Tenant for such rent and for such time (which may be for a term extending beyond the Term of this Lease), and upon such terms as Landlord in Landlord's sole discretion shall determine, and Landlord shall not be required, in the exercise of its reasonable judgment, to accept any tenant offered by the Tenant or to observe any instructions given by Tenant relative to such reletting. Landlord shall not be required to offer the Premises for lease in preference to other space available from it or its affiliates. In any case, Landlord



may make reasonable repairs, alterations, and additions to the Premises and redecorate the same to the extent deemed by Landlord necessary or desirable and in connection therewith, change the locks of the Premises, and Tenant shall upon demand pay the cost thereof together with all Landlord's reasonable expenses of reletting. Landlord may collect the rents from any such reletting and apply the same first to the payment of the reasonable expenses of reentry, redecoration, repair, and alterations and the expenses of reletting, and second to the payment of Rent herein provided to be paid by Tenant, and any excess or residue shall operate only as an off-setting credit to future Rent payable hereunder, but the use of such off-setting credit to reduce the amount of Rent due Landlord, if any, shall not be deemed to give Tenant any right, title, or interest in or to such excess or residue and any such excess or residue shall belong to Landlord solely; provided, that in no event shall Tenant be entitled to a credit on its indebtedness to Landlord in excess of the aggregate sum which the credit to Tenant is being determined, had no Default occurred. No such re-entry or repossession, repairs, alterations, and additions, or reletting shall be construed as an eviction or ouster of Tenant or as an election on Landlord's part to terminate this Lease, unless a written notice of such intention is given to Tenant, or shall operate to release Tenant, in whole or in part, from any of Tenant's obligations hereunder, and Landlord may, at any time and from time to time, sue and recover judgment for any deficiencies remaining after the application from time to time of the proceeds of any such reletting.

13.3    **Attorney Fees.**

In the event either party hereto fails to comply with any of the terms of this Lease to be complied with on its part or if Tenant holds over its tenancy in violation of this Lease, and the other party commences legal proceedings to enforce the terms of this Lease, the prevailing party in such proceedings shall receive from the other, and such non-prevailing party agrees to pay to the prevailing party, the prevailing party's reasonable attorney fees and reasonable costs incurred in connection with such enforcement action or proceedings. In addition, Tenant shall pay all of Landlord's costs, charges and expenses incurred by Landlord for negotiations on transactions with respect to reletting the Premises which Tenant causes Landlord as a result of Tenant's breach of this Lease and without Landlord's fault.

13.4    **Bankruptcy.**

In the event Tenant shall be adjudged bankrupt, or any trustee in bankruptcy shall be appointed for Tenant and not dismissed within the period provided herein above, Landlord and Tenant hereby agree, to the extent permitted by law, to request that a trustee in bankruptcy determine within sixty (60) days thereafter whether to accept or reject this Lease, and Tenant hereby agrees not to seek or request any extension or continuation of such time in any bankruptcy proceeding to assume or reject this Lease. In no event after the assumption of this Lease, shall any then existing Default remain uncured for a period in excess of the earlier of ten (10) days or the time period for curing such Default as set forth herein. Failure to cure such Default within such time shall constitute a Default hereunder. Landlord and Tenant agree that adequate assurance of performance of this Lease, as set forth in Section 365 (b)(i) of the Bankruptcy Code with respect to monetary Default under this Lease shall be in the form of cash or immediately available funds in an amount equal to at least the amount of such monetary Default so as to assure Landlord that it will realize the amount of such Default. If Tenant assumes this Lease and proposes to assign this Lease pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease, the notice of such proposed assignment, setting forth (1) the name and address of such person or entity, (2) all of the terms and conditions of such offer, and (3) the adequate assurance to be provided Landlord to assure such person's or entity's future performance under this Lease, shall be given to Landlord by Tenant within twenty (20) calendar days after receipt of such offer by Tenant, and in no event later than ten (10) calendar days prior to the date the Tenant shall make such application to the Bankruptcy Court for authority and approval to enter into such assumption and assignment. In addition, Landlord shall thereby have a right of first refusal to be exercised by notice to Tenant given within ten (10) days prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person or entity, less any broker's commissions which may be payable out of any consideration to be paid by such person or entity for the assignment of this Lease.

All money or other consideration payable by Tenant or otherwise to be delivered to or on behalf of Landlord under this Lease, whether or not expressly denominated as rent hereunder, shall constitute rent for purposes of Section 502(b)(vi) of the Bankruptcy Code and shall be the sole property of the Landlord.

13.5    **Landlord Default.**

Landlord shall not be in default unless Landlord fails to perform obligations required of Landlord within a reasonable time, but in no event later than thirty (30) days. No default shall exist until the expiration of the applicable cure period after Landlord's receipt of written notice by Tenant to Landlord specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for performance then Landlord shall not be in default if Landlord commences performance within such 30-day period and thereafter diligently prosecutes the same to completion.

**13.6    Waiver of Damages and Limitation of Recourse.**

Notwithstanding any provision in this Lease to the contrary, neither party to this Lease shall be liable to the other for any consequential, incidental or punitive damages (including without limitation, any claims for lost profits and/or lost business opportunity); provided, however, that such damages may be assessed by Landlord against Tenant in the event Tenant holds over its tenancy in violation of this Lease. The parties intend and agree that the doctrine of anticipatory breach or repudiation be and is applicable to this Lease. Notwithstanding any provision in this Lease to the contrary, any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord, Landlord's officers, directors, shareholders, members, employees, or agents, in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord, Landlord's officers, directors, shareholders, members, employees, or agents, except with respect to the Tenant Allowance set forth in Section 1.15.

## ARTICLE 14    SURRENDER OF POSSESSION

**14.1    Tenant's Duty.**

On or before the date this Lease and the Term hereby created terminates, or on or before the date Tenant's right of possession terminates, whether by lapse of time or at the option of Landlord (if Landlord has a right to terminate possession), Tenant shall at its sole cost and expense perform the following acts as herein set forth.

**14.1.1    Removal of Trade Fixtures.**

Remove from the Premises and the Building all of Tenant's trade fixtures and personal property (hereinafter "Personal Property").

**14.1.2    Surrender of Possession.**

Surrender possession of the Premises to Landlord, in the same condition as existed on the Commencement Date as modified by approved alterations and other modifications pursuant to ARTICLE 5, ordinary wear and tear and damage required to be repaired by Landlord due to a casualty excepted.

**14.2    Landlord's Rights.**

If Tenant shall fail or refuse to comply with Tenant's duty to remove all trade fixtures and Personal Property from the Premises and the Building on or before the expiration of its right to possession of the premises whether by expiration of the Term or otherwise, the parties hereto agree and stipulate that Landlord may, at its election after twenty (20) calendar days' prior written notice to Tenant and Landlord's statement of its intention, pursue either of the following remedies as herein set forth.

**14.2.1    Transfer of Title to Tenant's Trade Fixtures.**

Treat such failure or refusal as an offer by Tenant to transfer title to such Personal Property to Landlord, in which event title thereto shall thereupon pass under this Lease as a bill of sale to and vest in Landlord absolutely without any cost either by set-off, credit allowance or otherwise, and Landlord may remove, sell, donate, destroy, store, discard, or otherwise dispose of all or any part of said Personal Property in any manner that Landlord shall choose.

**14.2.2    Disposal of Tenant's Trade Fixtures.**

Treat such failure or refusal as conclusive evidence, on which Landlord shall be entitled absolutely to rely and act, that Tenant has forever abandoned such Personal Property, and without accepting title hereto, Landlord may, at Tenant's expense, remove, store, destroy, discard, or otherwise dispose of all or any part thereof in any manner that Landlord shall choose without incurring liability to Tenant or to any other person. In no event shall Landlord ever become or accept or be charged with the duties of a bailee (either voluntary or involuntary) of any such Personal Property, and the failure of Tenant to remove all such Personal Property from the Premises and the Building shall forever bar Tenant from bringing any action or from asserting any liability against Landlord with respect to any such Personal Property which Tenant fails to remove.

## ARTICLE 15    HOLDING OVER

Tenant shall pay to Landlord 150% of the Base Rent, Additional Rent, and all other amounts due under the Lease then applicable for the last month of the Term for each month, or portion thereof, that Tenant retains possession of the Premises or any part thereof after the termination of this Lease (or termination of Tenant's right to possession under this Lease), whether by lapse of time or otherwise. Any such holding over shall not be deemed to create a new tenancy of any term whatever and Landlord shall retain all rights against Tenant as exist under this Lease or at law or in equity.

## ARTICLE 16    NON-DISTURBANCE AND ATTORNMENT

**16.1    Non-disturbance.**

Subject to the terms of the Ground Lease, so long as Tenant is not in default in the payment of Rent or in the performance of any term of the Lease, then, subject to this ARTICLE 16, Tenant's possession of the Premises and its rights and privileges under the Lease shall not be diminished or interfered with by a mortgagee or Ground Lessor

**16.2    Attornment.**

If a mortgage is foreclosed for any reason, and a mortgagee succeeds to Landlord's interest under the Lease, Tenant shall be bound to the mortgagee under all of the terms of the Lease for the balance of the remaining Term with the same force and effect as if mortgagee were the landlord under the Lease.  Upon presentation of reasonable evidence that title has changed, Tenant hereby attorns to mortgagee as its landlord, such attornment to be effective and self-operative, without the execution of any further instrument by either party, as soon as mortgagee succeeds to the Landlord's interest under the Lease.  Notwithstanding any contrary provision herein, Tenant shall not be required to pay rent to the mortgagee until Tenant receives written notice from mortgagee that it has succeeded to Landlord's interest under the Lease.  The respective rights and obligations of Tenant and mortgagee upon such attornment shall, to the extent of the then remaining balance of the Lease Term, be the same as now set forth therein.

**16.3    Mortgagee's Obligations.**

If a mortgage is foreclosed for any reason and a mortgagee succeeds to the Landlord's interest under the Lease, such mortgage shall be bound to the Tenant under all of the terms of the Lease, and Tenant shall, from time and after such event, have the same remedies against mortgagee for the breach of the Lease that Tenant might have had under the lease against the prior landlord thereunder.  In no event shall mortgagee be liable for any act or omission of any prior landlord, be subject to any offsets or defenses which Tenant might have against any prior landlord, be bound by any amendment of this Lease made without the mortgagee's consent, or be bound by any rent which Tenant might have paid to any prior landlord for more than the current month.

**16.4    Binding Effect.**

The rights and obligations hereunder of Tenant and mortgagee shall bind and inure to the benefit of their respective successors and assigns.

**16.5    Subordination.**

Upon request of Landlord, Tenant shall subordinate its rights hereunder to the lien of any mortgage or mortgages, or the lien resulting from any other method of financing or refinancing now or hereafter in force against the real estate and/or buildings of which the Demised Premises are a part of or against any building any buildings hereafter placed upon said real estate of which the Demised Premises are a part.

**16.6    Ground Lease.**

This Lease is subordinate to the Ground Lease.  Tenant agrees that it will not act to cause a breach of the Ground Lease.  Notwithstanding anything to the contrary contained herein, Tenant shall not be required to pay Rent until a Subordination, Non-Disturbance, and Attornment Agreement for the Ground Lease in substantially the same form as Exhibit "I" hereto shall be executed by the County of DeKalb in favor of Tenant and delivered to Tenant.

## ARTICLE 17    ESTOPPEL

Each party agrees to execute, upon the written request of the other party, an estoppel letter in customary form.  Each party also agrees that from time to time upon not less than ten (10) business days' prior written notice by the other party, it will deliver to the other party a statement in writing certifying: (1) that this Lease is unmodified and in full force and effect (or if there have been modifications that this Lease as modified is in full force and effect); (2) the date to which the Rent and other charges have been paid; and (3) that the other party is not in default under any provision of this Lease, or, if in default, the nature thereof in detail.  Tenant agrees to execute and deliver to Landlord with ten (10) days of delivery of Landlord's request therefor any subordination, non-disturbance, and attornment agreement in favor of any mortgagee embodying the terms set forth in ARTICLE 16, above.

## ARTICLE 18    COMPLIANCE WITH LAWS

**18.1    Compliance.**

Tenant shall occupy and use the Premises in compliance with all and any applicable federal, state, and municipal laws, ordinances and regulations and shall not directly or indirectly, make use of the Premises which is prohibited by any such laws, ordinances or

regulations. Furthermore, Tenant shall, at its sole cost and expense, make any improvements and alterations to the Premises required by any applicable federal, state, and municipal laws, ordinances and regulations which first take effect during the Term of this Lease.

18.2    Hazardous Or Toxic Materials.

Notwithstanding any provision contained in this Agreement to the contrary, neither Tenant nor Landlord shall cause any escape, release, or disposal of hazardous or toxic materials as defined under any city, county, state, or federal law ("Haz Mat") below, in, at, on, or under the Building and/or the Premises. **TO THE BEST OF LANDLORD'S KNOWLEDGE AND BELIEF, NO HAZARDOUS MATERIALS HAVE BEEN RELEASED OR DISCHARGED AT, IN, OR UNDER THE SITE/BUILDING.** Neither Tenant nor Landlord shall store or use Haz Mats on, at, in, or under the Building and/or the Premises except as necessary for use in the ordinary course of business, and only in accordance with applicable laws, regulations and ordinances

18.2.1    Asbestos.

Landlord represents to Tenant that, to the best of its knowledge and belief, no asbestos containing materials ("ACM") exists on or in any part of the Building and/or the Premises. **LANDLORD WILL DISCLOSE THE LOCATION, APPROXIMATE AMOUNTS, AND CONDITION OF ANY ACM THAT IS DISCOVERED OR PRESUMED TO BE PRESENT WITHIN THE PREMISES AFTER THIS REPRESENTATION IS MADE, PURSUANT TO THE OCCUPATIONAL SAFETY AND HEALTH REGULATIONS, 29 CFR 1910.1001 AND 29 CFR 1910.1101.** On or before the Commencement Date, Landlord, at Landlord's sole cost and expense, shall promptly remove or abate all ACM and other Haz Mats discovered or known to be on, in or under the Premises that were not introduced by Tenant. If Tenant is unable to substantially complete the Tenant Improvements on or before the Commencement Date due to Landlord's work in the Premises associated with removal or abatement of any Haz Mats from the Premises, including but not limited to ACM, then the Commencement Date shall be delayed and Tenant shall be entitled to an abatement of Base Rent and Additional Rent up until such time that Tenant can substantially complete the Tenant Improvements without interference from Landlord's work. If during the Term of this Agreement, including any extensions thereof, Tenant, or any third-party acting on Tenant's behalf, encounters any ACM during the performance of alterations/ work, TENANT SHALL INFORM LANDLORD OF THE FACT. Landlord, at Landlord's sole cost and expense, shall handle the ACM that is disturbed in the Building except to the extent such ACM was installed or introduced by Tenant, Tenant's contractors, employees, or agents, in which case Tenant, at Tenant's sole cost and expense, shall remove such ACM in compliance with all laws. Notwithstanding anything to the contrary, Tenant shall not have any responsibility for managing, monitoring, disposing, or abating, nor be the owner of, nor have any liability for, or in connection with, any ACM not introduced by Tenant, Tenant's contractors, employees, or agents.

18.2.2    Allowable Use Of Certain Hazardous Materials.

Tenant may use and store the following materials in the ordinary course of its business: reasonable amounts of standard cleaning fluid and materials customarily used in conjunction with business machines; cleaning supplies in reasonable quantities; and any other materials deemed necessary to Tenant's general office purposes. Landlord may use, but not store, on the Premises the following materials in the ordinary course of business: cleaning supplies, insecticides, fungicides, and rodenticides.

18.2.3    Definition Of Hazardous Materials.

For purposes of this Agreement, "Hazardous or Toxic Materials" shall mean all materials or substances that have been determined to be hazardous to health or the environment, including, but not limited to, hazardous waste, as defined in the Resource Conservation and Recovery Act; hazardous substances as defined in the Comprehensive Emergency Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act; gasoline, or any other petroleum product or by-product or other hydrocarbon derivative; toxic substances, regulated by the Toxic Substances Control Act; insecticides, fungicides, or rodenticides, regulated by the Federal Insecticide, Fungicide, and Rodenticide Act; asbestos and radon and other toxic or hazardous air pollutants regulated by the Clean Air Act, as amended, substances determined to be hazardous or toxic water pollutants, regulated by the Clean Water Act, as amended, and toxic or hazardous chemicals regulated by the Occupational Safety and Health Act, as amended, or regulations promulgated under any such statute. State and local regulations, rules or law which are applicable shall also be included as a reference for the purpose of this definition. References to any statute, act, regulation, or rule shall include amendments as they are made from time to time.

18.2.4    Covenants.

Tenant and Landlord covenant that Landlord will provide Tenant with copies of all notices Landlord receives from any governmental authority regarding environmental matters in respect of the Premises and Tenant will provide Landlord with copies of all notices Tenant receives from any governmental authority regarding environmental matters in respect of the Premises. Tenant and Landlord covenant that removal, disposal, handling, use, and storage of any Hazardous or Toxic Materials by either the Tenant or the Landlord at the Premises shall comply with all applicable Federal, state, and local statutes, regulations, or ordinances. If either the Tenant or Landlord's use, transportation, storage, or disposal of Hazardous or Toxic Materials results in contamination of the Building, Property, or Premises, Tenant or Landlord shall notify the other party of its method, time, and procedure for any clean-up or removal of Hazardous or Toxic Materials.

16

The party notified shall have the right to require reasonable changes in such method, time, or procedure or require that the same be done after normal business hours or when the Building is otherwise closed (i.e., week-ends or holidays), except that if Tenant or Landlord is under a duty by Federal, state, or local laws, regulations, or ordinances to immediately remove the contamination, or is under an order to proceed in a specified manner, that party shall comply with the law, regulation, ordinance, or order.

### 18.2.5   Indemnification.

Tenant shall indemnify and hold Landlord harmless from any and all claims, damages, penalties, costs, liabilities or losses and any and all costs incurred due to the investigation, clean-up, removal, or restoration of the Premises or Building if such claims, damages, penalties, costs, liabilities, or losses are incurred due to hazardous or toxic substances introduced to the Premises or Building by the actions of Tenant, Tenant's agents, employees, or contractors. Tenant shall not indemnify Landlord for releases of Hazardous or Toxic Materials that exist on the Premises at the time of the execution of this Agreement or are brought into the Building, or on, in, or under the Premises by some other tenant or by Landlord or other third party (excluding third party contractors of Tenant). Landlord shall indemnify and hold Tenant harmless from any and all claims, damages, penalties, costs, liabilities, or losses and any and all costs incurred due to the investigation, clean-up, removal, or restoration of the Premises, if such claims, damages, penalties, costs, liabilities or losses are incurred by the actions of the Landlord, Landlord's employees, or contractors and which involve Hazardous or Toxic Materials as defined herein. The provisions of this Section 18.2 shall survive the expiration or sooner termination of this Agreement.

### ARTICLE 19       CERTAIN RIGHTS RESERVED BY LANDLORD

Landlord shall have the following rights as herein set forth, exercisable with notice (except as otherwise provided hereinafter) and without liability to Tenant for damage or injury to property, person, or business and without effecting an eviction, constructive or actual, or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for set-off or abatement of rent.

### 19.1    Showing Premises.

Landlord shall have the right to show the Premises to prospective tenants at reasonable hours, after notice to Tenant, and to place "for rent" signs, during the last six (6) months of the Term, as well as to post at any time "for sale" signs with respect to the Property without notice to, or approval by, the tenant.

### 19.2    Approval of Certain Fixtures.

Landlord shall have the right to approve the weight, size, and location of safes and other heavy equipment and bulky articles in and about the Premises, and to require all such items, including furniture and other similar items, to be moved into or out of the Building and Premises only at such times and in such manner as Landlord shall direct in writing. Any damages done to the Building, Property, or Premises or to other tenants in the Building by taking in or putting out safes, furniture, or other articles, or from overloading the floor in any way, shall be paid by Tenant. Furniture, boxes, merchandise, or other bulky articles shall be transported only upon or by vehicles equipped with rubber tires. Movements of Tenant's property into or out of the Building and within the Building shall be entirely at the risk and responsibility of Tenant and under the control of Landlord.

Landlord may enter upon the Premises and may exercise any or all of the foregoing rights hereby reserved without being deemed guilty of an eviction or disturbance of Tenant's use or possession and without being liable in any manner to Tenant.

### ARTICLE 20       RULES AND REGULATIONS

Tenant agrees to observe the reservations to Landlord in ARTICLE 9, ARTICLE 19, and such rules and reasonable regulations as Landlord, in its continuous or recurring discretion, may from time to time make for the Premises, which rules shall apply to Tenant and each of the other tenants in the Premises. Any failure by Tenant, its employees, agents, servants, clients, customers, invitees, licensees, and/or guests, to observe and comply with all such reservations, rules, and regulations shall constitute a Default under this Lease, subject to the notice and cure provisions of this Lease otherwise applicable to such Defaults. The rules regulations shall be applied by Landlord uniformly to all tenants in the Premises.

### ARTICLE 21       ASSIGNMENT AND SUBLETTING

Tenant may not voluntarily assign or encumber its interest in this Lease or in the Premises, or sublease all or any part of the Premises, or allow any other person or entity (except Tenant's authorized representatives) to occupy or use all or any part the Premises, without first obtaining Landlord's prior written consent which shall not be unreasonably withheld or delayed. In no event shall Tenant be released from any of its obligations under this Lease. In the event of such an assignment or sublet, Landlord shall be provided upon request with documentation satisfactory to it in Landlord's sole discretion that this Lease is binding upon such affiliate and successor and that such




affiliate or successor is financially capable of performing the obligations of Tenant under this Lease. Any assignment or sublease without Landlord's required prior written consent shall be voidable and, at Landlord's election, shall constitute a Default. Notwithstanding any provision of this Lease to the contrary, Tenant shall remain primarily liable for all covenants, agreements, obligations, and rents under this Lease in the event of any assignment or sublease.

## ARTICLE 22    NOTICE

All process, notices or other writings either required hereunder or desired to be sent or served by either of the parties hereunder, shall be in writing and shall be delivered personally or sent by U.S. Mail, with postage prepaid and by recognized national courier service and addressed to the respective party at the address shown in Section 1.1.2 or 1.2.2 or such an address as given by Notice from one party to the other. Any notice served shall be deemed effective on the date received or refused by the addressee. Following occupancy by Tenant, the address for Tenant for purposes of the Notice shall be the Building address.

## ARTICLE 23    CONVEYANCE BY LANDLORD

In case Landlord or any successor owner of the Building shall convey or otherwise dispose of any portion thereof to another person including any mortgagee, such other person shall thereupon be and become Landlord hereunder and shall be liable upon all liabilities and obligations of this Lease to be performed by Landlord which first arise after the date of such conveyance and Landlord shall be released from any further such responsibility, liability, and claims under this Lease; provided, such transferee assumes Landlord's obligations hereunder.

## ARTICLE 24    RECORDING

Landlord or Tenant, at either's option, may record a memorandum of this Lease in form reasonably satisfactory to attorneys for Landlord and Tenant for the purpose of giving notice of its terms and provisions, and Landlord and Tenant, if either requests, agree that they will execute such memorandum.

## ARTICLE 25    SIGNAGE

25.1    **Exterior Pylon Sign.**

Tenant, at its sole cost and expense, shall be entitled to install the name of its business on a two-sided sign panel (the "Panel") in the position described in Section 1.12.2. The Panel shall be not exceed the dimensions set forth in Section 1.12.1. Tenant shall pay Landlord within ten (10) days of the Commencement Date an amount equal to the pro rata cost of the pylon sign, including installation, and the cost to extend electrical service thereto, and the fabrication and installation costs of the Panel. Tenant shall reimburse (as an Operating Expense) Landlord for Tenant's pro rata share of the reasonable costs and expenses incurred in maintaining, repairing, replacing, and operating such sign and pylon, except that the full cost of repair or replacement of Tenant's Panel shall be borne by Tenant.

25.2    **Exterior Wall Sign.**

Tenant may also install wall signs on the external wall of the Premises at Tenant's sole cost. The exact size, color, design, and placement of Tenant's signs shall be subject to approval by Landlord, but should not exceed the area set out in Section 1.12.3. Upon vacating the Premises, the Tenant shall restore the external wall of the Premises to its original condition, at Tenant's cost.

25.3    **Signs.**

Tenant shall not place on any exterior door, wall, or window of the Demised Premises any signs or advertising matter without first obtaining Landlord's written approval and consent.

## ARTICLE 26    INDEMNIFICATION

26.1    **Landlord's Indemnification.**

Tenant hereby indemnifies and holds Landlord harmless from and against any and all claims, demands, liabilities, losses, damages, and expenses, including reasonable attorney fees, arising from the negligence or willful misconduct of Tenant or its agents; employees or contractors in or about the Premises and common areas, or arising from Tenant's occupancy or use of the Premises, except to the extent caused by Landlord's negligence or willful misconduct or as to any claims, demands, liabilities, losses, damages, and expenses, including reasonable attorney fees, covered by insurance required to be maintained by the Landlord under ARTICLE 8 of this Lease.

**26.2    Tenant's Indemnification.**

Landlord hereby indemnifies and holds Tenant harmless from and against any and all claims, demands, liabilities, losses, damages, and expenses, including reasonable attorney fees, arising from the negligence or willful misconduct of Landlord or its agents, employees or contractors in or about the Premises and common areas, or arising from the use of the common areas, except to the extent caused by Tenant's negligence or willful misconduct or as to any claims, demands, liabilities, losses, damages, and expenses, including reasonable attorney fees, covered by insurance required to be maintained by the Tenant under ARTICLE 8 of this Lease.

## ARTICLE 27    CONSTRUCTION

**27.1    Landlord's Work.**

Landlord shall deliver to Tenant the Premises in accordance with the plans to be attached hereto as Exhibit C ("Landlord's Work"). The scope of Landlord's Work shall be as set forth on Exhibit C-1 as attached herein and incorporated by reference, and the Plans shall be consistent with Exhibit C-1. Provided Landlord receives a fully executed original of this Lease prior to the Lease Execution Date set out in Section 1.3, Landlord's Work shall be substantially completed on or before the Substantial Completion Date set out in Section 1:13, subject to any delay caused by any Force Majeure Delay or Tenant Delay. If a fully executed original of this Lease is not delivered to Landlord prior to the Lease Execution Date (per Section 1.3), then the Substantial Completion Date shall be extended by the period of time from the Substantial Completion Date (per Section 1.13) to the date Landlord receives a fully executed original of this Lease. All construction shall be completed in a good and workmanlike manner in compliance with the laws, regulations, and rules of applicable governmental authorities, including the Americans with Disabilities Act. Within the limitations set forth below, Landlord agrees that it shall promptly correct all improvements not completed in a good and workmanlike manner or defective work material or work which fails to conform to the Plans, whether such defect or failure is observed before or after completion or occupancy by the Tenant. All costs of correcting such work shall be the expense of the Landlord.

**27.1.1    Tenant Delay.**

The term "Tenant Delay" shall mean any delay that Landlord may encounter in the performance of Landlord's obligations under this Lease because of any act or omission of any nature by Tenant or its agents or contractors, including any:  (1) material delay attributable to changes in or additions to Landlord's Work; (2) material delay by Tenant in the submission of information or the giving of approvals required under this Lease.

**27.1.2    Force Majeure Delay.**

The term "Force Majeure Delay" shall mean any delay incurred by Landlord in the design of Landlord's Work or completion of Landlord's Work attributable to any:  (1) actual delay or failure to perform attributable to any civil disturbance, further order claiming jurisdiction, act of public enemy, war, riot, sabotage, blockade, or embargo; (2) delay due to changes of any applicable laws (including without limitation, the ADA), Landlord's Work Specifications, or the interpretation thereof where the interpretation delay is caused by Tenant; (3) Tenant's non-approval or failure to approve in a timely manner the interior and exterior finishes of the Building, the floor plate and the core configurations of Landlord's Work, unless there is reasonable justifications for such non-approval or untimely approval; or (4) delay attributable to lightning, earthquake, fire, storm, hurricane, tornado, flood, washout, explosion, or any other similar industry-wide or building-wide cause beyond the reasonable control of the party from whom performance is required, or any of its contractors or other representatives, excluding strike or work stoppage.

**27.2    Tenant Approval.**

Tenant shall review and approve Landlord's Work within ten (10) calendar days of receipt by Tenant; such approval not to be unreasonably withheld, conditioned or delayed. During the course of construction, the parties recognize that minor deviations from Landlord's Work by Landlord's contractor may occur and it is agreed that such minor deviations which do not impair the floor plans or Tenant's utilization of the Premises shall not constitute a breach of the terms of this Lease. All labor and materials provided in any improvements or substitutions therefore shall be of like quality and value.

**27.3    Accepting Possession.**

Tenant's taking possession of the Premises and acceptance of the Premises for occupancy shall not constitute a waiver of any warranty or of any defect in regard to workmanship or material of Landlord's Work ("Construction Defect"). Landlord shall have thirty (30) business days within which to correct or remedy any Construction Defect; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) business days are required for performance then Landlord shall not be in default if Landlord commences performance within such thirty (30) business day period and thereafter diligently prosecutes the same to completion. During the period of construction, Tenant, its agents, employees, and representatives can enter the Premises for completion of Tenant's Work, inspections, measurements, and installations of Tenant's equipment and fixtures and for other

similar purposes without being deemed to have taken possession of the Premises, provided, however, Tenant shall not interfere with Landlord's Work.

**27.4    Tenant's Work.**

    **27.4.1    Tenant's Allowance.**

    Landlord agrees to provide Tenant with an allowance as set out in Section 1.15 per RSF of the Building ("Tenant's Allowance") for the purpose of constructing Tenant's leasehold improvements ("Tenant's Work"). Landlord agrees that Tenant's Allowance shall be due and payable to Tenant thirty (30) days following substantial completion of Tenant's Work [when (a) certified to Landlord by Tenant's architect; or (b) evidenced by both a certificate of occupancy and Tenant being open for business] and upon receipt by Landlord and its title insurer of an affidavit(s) from Tenant identifying all contractors, subcontractors, and material suppliers providing work or materials for Tenant's Work, together with properly executed lien waivers and sworn statements from the architect or general contractor, if no architect. Any unused portion of Tenant's Allowance shall, at Tenant's written election, be used as: (1) a Rent credit against either the first month's Rent owing, or (2) a Rent credit spread evenly over a period of time. Landlord shall not be liable for any costs incurred by Tenant in excess of the specified allowance. At Tenant's election, Landlord shall employ an architect at Tenant's expense for purposes of this paragraph.

    **27.4.2    Tenant's Architect and Contractors.**

    Subject to the provisions of Section 27.4.5, Tenant may select its own architect and contractors for the construction of Tenant's Work subject to the reasonable approval of Landlord, which shall not be unreasonably delayed or withheld, and Tenant shall enter into contracts directly for the provision of such services.

    **27.4.3    Tenant's Workmanship.**

    Tenant warrants that Tenant's Work shall be completed in a good and workmanlike manner in compliance with the laws, regulations, codes, and rules of applicable governmental authorities, including the Americans with Disabilities Act, at Tenant's sole cost and expense, and Tenant shall take, at Tenant's sole cost and expense, any and all actions to keep Tenant's Work in full compliance with all laws, regulations, codes, and rules of applicable governmental authorities.

    **27.4.4    Tenant's Additions and Improvements.**

    All Tenant's Work and additions and alterations to the Premises made during the Term of this Lease shall be the property of Tenant, but shall become property of Landlord upon the termination of this Lease, without cost to Landlord.

    **27.4.5    Unions.**

    Tenant acknowledges that Landlord intends to use union contractors for Landlord's Work, and, therefore, Tenant is similarly required to utilize union contractors and subcontractors for the completion of Tenant's Work.

    **27.4.6    Tenant Permits.**

    Tenant shall apply for all permits which are a pre-condition to it undertaking Tenant's Work at least thirty (30) days prior to the Anticipated Substantial Completion Date. Thereafter, Tenant shall continue to exert its best efforts to pursue the issuance of the permits with all due diligence until same are granted.

**ARTICLE 28    MISCELLANEOUS**

**28.1    Binding Effect.**

This Lease shall be binding upon and inure to the benefit of the successors and assigns of Landlord, and shall be binding upon and inure to the benefit of Tenant, its successors, and, to the extent subleasing or assignment may be approved by Landlord hereunder, Tenant's sublessees and assigns.

**28.2    Illinois Law Governs.**

This Lease is declared to be an Illinois contract, and all of the terms thereof shall be construed according to the internal laws of the State of Illinois, that is without reference to any conflict provisions.

**28.3    Headings.**

Landlord and Tenant mutually agree that the headings and captions contained in this Lease are inserted for convenience of reference only, and are not to be deemed part of or to be used in construing this Lease.

20

**28.4    Severability.**

If any term or provision of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**28.5    Relationship of Parties.**

Nothing contained herein shall be deemed or construed by the partied hereto, or by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of Rent nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.

**28.6    Rent.**

All amounts due and payable from Tenant under this Lease shall be considered as Rent.

**28.7    Consents and Waivers.**

No consent or waiver, by either party expressed or implied, to or of any breach of any covenant, condition, or duty of the other party shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition, or duty.

**28.8    Remedies Cumulative.**

No remedy herein or otherwise conferred upon or reserved to Landlord shall be considered to exclude or suspend any other remedy but the same shall be cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute, and every power and remedy given by this Lease to Landlord may be exercised at any time and from time to time and so often as occasion may arise or as may be deemed expedient.

**28.9    Delay.**

Whenever a period of time is provided in this Lease for Landlord to do or perform any act or thing, and except as specifically stated otherwise in this Lease, Landlord shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war or governmental regulation beyond the reasonable control of Landlord and in any such event said time period shall be extended for the amount of time Landlord is delayed.

**28.10    Submission of Lease.**

The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises, and this document becomes effective and binding only upon the execution and delivery hereof by Tenant and Landlord, and approval by Landlord's mortgagee if applicable.  All negotiations, considerations, representations, and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement in writing between Landlord, and Tenant, and no act or omission of any employee or other agent of Landlord shall alter, change, or modify any of the provisions hereof.

**28.11    Context.**

All terms used in this Lease, regardless of the number or gender in which they are used shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter as the context or sense of this Lease or any Article, Section or clause herein may require, as if such terms has been fully and property written in such number or gender.

**28.12    Brokerage.**

Tenant and Landlord each warrant that it has had no dealings with any broker or agent in connection with this Lease except for Rada Realty who shall be paid a commission by Landlord pursuant to a separate agreement.  Each party agrees to fully defend, hold harmless and indemnify the other from and against any and all cost, expense or liability from any compensation, commissions and charges claimed by any broker or agent in connection with this Lease or the negotiations thereof.

**28.13    Authorship.**

This Lease has been the subject of extensive negotiations between the parties and the interpretation hereof shall not be based upon any presumption that either party has been the drafter hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Lease under their seal as of the day and year first above written.

LANDLORD:                                       TENANT:

Sunil DeKalb, L.L.C.                            Mattress Giant Corporation,
an Illinois limited liability company          a Texas corporation

By: _____                    By: _____
    Sunil Puri                                      Phil Lang
Its: Member                                     Its: President

## EXHIBIT TABLE OF CONTENTS

A-    Title Exceptions

B-    Legal Description Premises

C-    Legal Description Property

D-    Prohibited Uses

E-    Recognized Exclusives

F-    Sales Tax Consent

G-    Landlord's Work

H-    Employee Parking



## EXHIBIT A

Title Exceptions

1.    General Real Estate Taxes not yet due and payable.

2.    Right of way for drainage ditches, tiles, feeders and laterals.

3.    Easement Grant by County of DeKalb to Contel of Illinois, Inc., d/b/a GTE Illinois dated May 22, 1992 and recorded November 2, 1992 as Document Number 92015959.

4.    Rights of Commonwealth Edison Company to use the roads and highways in said Township for the transmission and distribution of electrical energy as per the resolution recorded as Document Number 306134.

5.    Rights of the public, the State of Illinois and the municipality in and to that part of the land, if any, taken or used for road purposes.

6.    Permit dated September 12, 1951 and recorded November 5, 1951 as Document Number 245817 made by County Commissioners of DeKalb County to Illinois Commercial Telephone Company, its successors and assigns for the installation and maintenance of telephone poles, anchors, and wire on and along County and State Aid roads in DeKalb County, State of Illinois.

7.    Existing recorded and unrecorded leases and all rights thereunder of the lessees and of any person claiming by, through or under the lessees.

8.    Right of way made by County Commissioners of DeKalb County to Central Union Telephone Company dated July 12, 1894 and recorded December 11, 1896 in Book "D" of Miscellaneous Records, Page 306 as Document Number 12963 granting right to install and maintain its facilities along the highway of DeKalb County, Illinois.

9.    Subject to the terms and conditions as contained in the Intergovernmental Cooperation Agreement made by and between the County of DeKalb and the DeKalb County Forest Preserve District dated March 17, 1999 and recorded May 3, 1999 as Document Number 99008454. Note: For further particulars,

10.    Reciprocal Easement with land adjoining the property for purposes of pedestrian and vehicular ingress and egress, all as contemplated pursuant to Article 14 of the Ground Lease.

11.    Easement for pedestrian and vehicular ingress and egress reserved to the county for the operation of a cemetery located on land adjoining the property as contemplated at Section 14.2 of the Lease.

12.    Conservation easement for the benefit of the Forest Preserve District as it affects Lots 5 and 6 as recorded April 12, 2001 as Document Number 2001005548 and as shown on the recorded Plat.

13.    Building Setback line as disclosed on Plat of Subdivision.

14.    Easement for utilities, watermain and sanitary sewer and stormwater drainage easement as contained on the Plat of the Subdivision.

15.    Circulation easements as disclosed by the Plat of the Subdivision.

16.    Notes as contained on recorded Plat of Subdivision:

a) The bearing system is based upon the Plat of Oakland Place Subdivision

b) There shall be no access to Sycamore Road from any Lot except by way of the two access points shown

c) The Storm water detention has been provided on the property located adjacent to and West of this Plat.

d) With respect to Forest Preserve District Property, this Plat creates utility easements only as shown hereon. All other easement areas to and from the DeKalb County Forest Preserve District (FPD) are shown for informational purposes only. Except for utility easements as noted hereon, no dedications, easements or other interests to or from the FPD are created by this Plat. Specific terms of any separately recorded easements (other than the utility easements shown hereon) shall create all other easements and govern the terms and conditions thereof.

e) The right is also granted to The DeKalb Sanitary District to cut, trim or remove trees, bushes and fences as may be reasonably required incident to the rights herein granted, and the right to enter upon said property for all such purposes stated herein. No permanent buildings or trees shall be placed on said easements, however, the same may be used for gardens, shrubs, landscaping and other purposes that do not then or later interfere with the aforesaid uses or rights herein granted.

17.   Mortgage made by Firstar Bank, N.A., recorded July 11, 2001, as document number 2001-011728.

**EXHIBIT B**

Legal Description Premises


Lot 3 in the Final Plat of DeKalb County Shopping Center, being a subdivision of part of the South half of Section 12, Township 40 North, Range 4 East of the Third Principal Meridian, as recorded April 12, 2001, in Book "2" of Plats, page 627, as document number 2001005550, in DeKalb County, Illinois.

EXHIBIT C

Legal Description of Property

Parcel One

The following land being a subdivision of part of the South Half (1/2) of Section Twelve (12), Township Forty (40) North, Range Four (4) East of the Third (3rd) Principal Meridian, bounded and described as follows, to-wit: Commencing at the Northeast corner of Lot "A" of the C.M. Cheatham Subdivision, according to the Plat thereof recorded in Volume "N" of Plats, Page 2 in the DeKalb County Recorder's office, said point being on the center line of the Old Sycamore Road; thence North 65 degrees 22 minutes 31 seconds West, along said Northerly boundary line of Lot "A" as aforesaid, 32.00 feet to the point of beginning for the following described Tract; thence continuing North 65 degrees 22 minutes 31 seconds West, along said North line of Lot "A" as aforesaid, 210.00 feet; thence North 24 degrees 37 minutes 29 seconds East, at right angles from the preceding course, 115.27 feet; thence North 51 degrees 53 minutes 22 seconds West, 439.45 feet; thence North 38 degrees 06 minutes 38 seconds East, at right angles from the preceding course, 504.75 feet to the Southerly line of the Plat of Oakland Place, the Plat of which Subdivision being recorded in Book Y of Plats on Page 61 in said Recorder's Office; thence South 68 degrees 47 minutes 13 seconds East, along the Southerly line of said plat of Oakland Place and the Southerly line of the Plat of Oakland Place Resubdivision, the Plat of which Resubdivision being recorded in Book Z of Plats on Page 34 in said Recorder's Office, 700.00 feet to the Westerly Right of Way line of S.B.I. Route 23 as said road is now located and laid out; thence Southwesterly along a circular curve to the right having a radius of 4463.44 feet and whose center lies to the West and along the West line of said Route 23 to a point (the chord across the last described circular curve course bears South 36 degrees 57 minutes 23 seconds West, 34.63 feet); thence Southwesterly, along a circular curve to the right having a radius of 20283.90 feet and whose center lies to the West and along the West line of said Route 23 to the point of beginning (the chord across the last described circular curve course bears South 38 degrees 06 minutes 20 seconds West, 736.71 feet), situated in DeKalb County, Illinois.

Parcel Two

An easement for parking, drive, and utilities over: Part of the South Half of Section 12, Township 40 North, Range 4 East of the Third Principal Meridian, described as follows: Commencing at the Northeast corner of Lot "A" of the C.M. Cheatham Subdivision, according to the Plat thereof recorded in volume "N" of Plats, page 2 in the DeKalb County Recorder's Office, said point being on the center line of the Old Sycamore Road; thence Northwesterly, along the Northerly boundary line of said Lot "A", 242.0 feet for a point of beginning; thence continuing Northwesterly, along the last described course, 20.02 feet; thence Northerly, at an angle of 80 degrees 09 minutes 11 seconds, measured counterclockwise from said North line, 110.49 feet; thence Northwesterly, at an angle of 76 degrees 28 minutes 02 seconds, measured clockwise from the last described course 108.70 feet; thence Northwesterly, at an angle of 174 degrees 49 minutes 50 seconds, measured clockwise from the last described course, 124.56 feet; thence Westerly, at an angle of 167 degrees 49 minutes 13 seconds, measured clockwise from the last described course, 50.04 feet; thence Northwesterly, at an angle of 129 degrees 14 minutes 26 seconds, measured counterclockwise from the last described course, 87.57 feet; thence Northerly, at an angle of 130 degrees 02 minutes 49 seconds, measured counterclockwise from the last described course, 98.21 feet; thence Southeasterly, at an angle of 66 degrees 11 minutes 30 seconds, measured counterclockwise from the last described course, 383.81 feet; thence Southwesterly, at an angle of 103 degrees 29 minutes 09 seconds, measured counterclockwise from the last described course, 115.27 feet to the point of beginning, all in DeKalb Township, DeKalb County, Illinois.

## EXHIBIT D

### Prohibited Uses

1.  No use that would violate any certificate of occupancy for the Property

2.  No use that would make void or voidable any insurance then in force with respect to the Property, or which may make it impossible to obtain fire or other insurance thereon required to be supplied by the Landlord under the Ground Lease.

3.  No use that will cause or is apt to cause structural injury to any building on the Property.

4.  No use that would constitute a public or private nuisance.

5.  No use that would violate the Ground Lease.

6.  No portion of the Property shall be used or operated:

    6.1    In violation of applicable laws, rules or regulations.

    6.2    In a dangerous or hazardous manner.

    6.3    As a nuisance, or as an obnoxious use by reason of unsightliness or excess emission of noxious odors, dust, fumes, vapors, smoke, liquid waste, noise, glare, vibration or radiation including, without limitation, a recycling facility or stockyard, a junkyard, for industrial factory, manufacturing, warehouse (excluding any warehouse incidental to the operation of permitted retail uses hereunder) purposes; or any use which creates a fire, explosive or other hazard, provided, however, that nothing contained in this subsection shall limit or prohibit the operation of a supermarket, floral store or department, video store or department, bank or pharmacy.

    6.4    As an adult book store, night club or discotheque (except as expressly permitted under subsection (vii) below), manufacturing facility, warehouse, dance hall, massage parlor, or any other establishment which provides live adult entertainment or which sells, rents or exhibits pornographic or obscene materials.

    6.5    For any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation (provided that any tenant that goes out of business shall be entitled to hold one going out of business sale not exceeding four weeks in duration).

    6.6    As an automobile body and fender shop; an automobile repairs shop (mechanical or otherwise) or any business servicing motor vehicles, including, without limitation, any quick lube oil change services, or a car wash; provided, however, the foregoing shall not prohibit the operation of an auto parts retail store.

    6.7    As a bar or tavern (or any establishment where beer, wine or liquor is served for on-premises consumption) or restaurant; provided, however, that restaurants (such as Chili's, TGI Friday's, or Applebee's) whose principal purpose is the sale of food and which have incidental sales of beer, wine and/or alcohol shall be permitted.   For purposes of this subsection (vii), sales of beer, wine and/or alcohol shall be deemed "incidental" only if such sales do not constitute more that 50% of the total gross retail sales, for any period of 12 consecutive months, of any such business.

    6.8    As a second-hand store or business selling so-called "second hand goods" (except that a "Play it Again Sports," and "Once Upon a Child" shall be permitted), flea market, pawn shop, government surplus store, Goodwill Store, salvage store, Salvation Army Store, surplus store or liquidation store.

    6.9    As a circus; carnival; bowling alley; veterinary hospital; funeral parlor or mortuary; car wash; game room or arcade; billiard or pool hall; unemployment office; school or place of instruction attended by students; post office; bingo parlor, casino, off track betting facility, or any betting establishment (except that the sale of state lottery tickets is not prohibited or restricted); any sports or entertainment facility (including, without limitation, a karate or other martial arts facility, gymnasium, health club or physical fitness facility).

    6.10   No building may have a rooftop sign.  No billboard signs are permitted.

    6.11   A catering or banquet hall.

    6.12   Outdoor recreation or amusement areas.

    6.13   A fast food restaurant incorporating a coin or token operation amusement room.

    6.14   Auditorium, meeting hall or other place of assembly, skating rink, hotel or lodging facilities; gun range.



6.15    A dry cleaning or laundry plant (except for an establishment which receives and dispenses items for launder and/or dry cleaning but the processing of such items is done elsewhere or utilizes processes which do not expose the Shopping Center to risk of contamination by hazardous materials regulated by CERCLA or similar successor status).

6.16    A health or medical clinic or rehabilitative facility (other than a non-surgical clinic) provided that the foregoing shall not be deemed to preclude dentist's, doctor's or orthodontist's offices from being located on the Property (as customarily found in retail shopping centers) provided that the aggregate leasable area occupied by such uses does not exceed fifteen percent (15%) of the constructed leasable area on the Property; a house of worship; hotel/motel or residential purposes.

6.17    For any use which creates a nuisance or for purposes of a cocktail lounge, bar, disco, bowling alley, pool hall, billiard parlor, automobile repair facility, adult book store, adult theater, adult amusement facility, or any facility selling or displaying pornographic materials or having such displays.

 

## EXHIBIT E

### Recognized Exclusives

Tenant shall not use its Premises for the following uses:

A.   1.   the sale of toys in excess of 10,000 square feet, except for incidental sale in not more than 15% of such Premises.

2.   a food and/or beverage operation which derives more than 25% of the gross sales for each food and/or beverage operation from the sale of coffee and/or coffee-based products, including a coffee bar as an incidental use of such Premises, except outlots.

3.   a café or coffee bar in any Premises in excess of 10,000 square feet, if such café or coffee bar occupies less than 50% of such Premises, except outlots.

Such covenants shall only be in effect provided the tenant with such exclusive is using its premises for the sale of such items upon the terms and conditions stated in such tenant's lease.

B.   "craft show," store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, artificial flowers, artificial floral arrangements, wedding or party goods (except apparel), or any store similar to the tenant holding the exclusives (Michael's) in operation or merchandising as of the date of this Lease, except incidental to a lessee's primary use, unless the total space which such lessee devotes to the products or services which violate the exclusive exceeds one thousand (1,000) leasable square feet (inclusive of allocable aisle spaces and line or shelf space); and further provided, in no event shall this exception for incidental use apply to picture framing services, it being the intention that no other lessee or occupant of the Shopping Center shall be permitted to offer picture framing services.

Such covenants shall only be in effect provided the tenant with such exclusive is using its premises for the sale of such items upon the terms and conditions stated in such tenant's lease.

C.   a primary business as the sale of bath & body care products, or the sale of candles and related accessories. Primary business means the total sales in a store or business dedicated to the display of such items is more than twenty percent (20%) of the total sales area in such store or business.

Such covenants shall only be in effect provided the tenant with such exclusive is using its premises for the sale of such items upon the terms and conditions stated in such tenant's lease.

D.   in an area containing less than 15,000 square feet, an apparel store selling men's or women's clothing and/or apparel, or a store selling junior, missy or women's clothing and/or apparel similar in operation to, but not limited to, a Catherine's, Fashion Bug, Dress Barn, and Maurices.

E.   a footwear store selling footwear and related men's and women's accessories including sports apparel, handbags, belts, and socks similar in operation to, but not limited to, M C Sports, Shoe Carnival, Famous Footwear and Payless Shoes.



F.      a store selling books, periodicals, music products (pre-recorded music media such as CDs, tapes, and records, plus accessories), video tapes, calendars, greeting cards, and stationery similar in operation to, but not limited to Borders, Oncue, Hallmark, Barnes & Noble and Books a Million.


G.      a store selling, renting, or servicing electronic equipment or appliances including but not limited to television, stereos, cell phones, video recorders, refrigerators, dishwashers, microwave ovens, washers, dryers and car audio similar in operation to, but not limited to Best Buy, Circuit City, and Rex TV.


H.      a store selling prescription drugs, health related products, beauty products, cards, stationery, photo equipment, toys similar in operation to, but not limited to, Walgreens, Osco Drugs, CVS Drugs, and Rite Aid.


I.      a store selling office supplies, including office and home office furniture, office fixtures, office machines, and equipment/electronics, photocopying services, computers, software and accessories similar in operation to Office Depot, Staples, Office Max and Kinko's.


J.      a store selling or displaying for sale wicker or rattan furniture, decorative household furnishings of an imported nature and intended to be used in sunrooms, living, dining and kitchen areas and on patios or housewares imported from the Far East or Europe, all being customarily sold in Pier One's retail stores, unless such use or purpose is incidental, as defined below, to such business.  For purposes hereof, the incidental sale of such items in connection with the overall business of another operator or tenant shall not be deemed a violation hereof.  As used herein, incidental use or purpose shall mean the sale of such wicker or rattan furniture, decorative household furnishings or housewares which for any one (1) such product line does not occupy greater than ten percent (10%) of any such occupant's space in the Shopping Center.


K.      no premises in the Shopping Center shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of apparel (as defined by the trade from time to time), including the computation of such floor area one-half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of apparel, provided, however, that is at least ten thousand (10,000) square feet of the Demised Premises ceases to be devoted to the sale or display of apparel and such cessation continues for longer than one hundred twenty (120) consecutive days (except as a result of remodeling, repairs, fire, casualty or other force majeure events), then the foregoing restriction in this Paragraph K shall be  of no further force and effect, and provided further that, if after the expiration of the one hundred twenty (120) consecutive day period described in the immediately preceding proviso, a store devoting at least ten thousand (10,000) square feet of the Demised Premises to the sale or display of apparel is operated in the Demised Premises, then the foregoing restriction in this Paragraph K shall be reinstated, subject to any leases that Landlord may have entered into during the period for which the restriction in this Paragraph K was not in effect.

## EXHIBIT F

### Authorization to Release Sales Tax Information

Barbara J. Henry, Manager
Illinois Department of Revenue
Local Tax Allocation Division
101 W. Jefferson St (Level 3-500)
Springfield, IL 62702

Dear Ms. Henry:

The undersigned is an owner/authorized office of Mattress Giant ("Taxpayer"), which is doing business in the name of development located at _____ Sycamore Road, in DeKalb, Illinois.

In order to induce the development of the DeKalb County Shopping Center, the City of DeKalb and DeKalb County are utilizing certain sales tax revenue to provide certain benefits with respect to said development.

Pursuant to Section 112 of the Retailers' Occupation Tax Act (35 ILCS 120/11) the undersigned taxpayer hereby authorizes the Illinois Department of Revenue to disclose to the City of DeKalb and DeKalb County the monthly/quarterly amount of the local share of the state sales tax payments made by the taxpayer beginning with the sales made in the month of _____, 2001, and continuing through _____, 2001, or until the Illinois Department of Revenue is notified to discontinue this reporting, provided that such disclosure shall be made in the form of a combined figure indicating the aggregate total of all Illinois sales tax paid by tenants of DeKalb County Shopping Center.


TAXPAYER:

Mattress Giant

By:_____

      (signature)

Name:_____

      (print)

Title:_____

Illinois Business Tax Number:


_____

Telephone number_____


F-

**Exhibit G**

**Landlord's Work**

## SHELL PRICE:

<u>Items specifically "Included" in this price:</u>
- Related architectural and engineering costs needed for construction and permits.
- Site work based on starting with a "table topped" site, including the stone pad under the building floor slab.
- All concrete foundation work (footing and foundation excavation & backfilling etc.) inside the building line only, no concrete floor.
- All roof and wall work included to create a water tight finished product as viewed from the outside of the building. ~ *Including Storefront*
- Electrical main service (overhead or underground).
- Switching and or disconnects for items within SHELL quote.
- Lighting physically mounted on the outside of the building if specified (for non-esthetical purposes only).
- One (1) back flow preventer only for landscaping irrigation system.
- Any fire protection system as required, including work from building line, back-flow" preventer, distribution and upright heads as required for a complete system.
- In the event there are any designated "common areas" the finishing of these areas are to be included.
- Turn-Key Common areas. (If common areas are specified then they are completely finished as part of the Shell costs.)
- *All utilities brought to within 5 feet of rear of building Shell. W/ services stubbed*

<u>Items specifically "Excluded" from this price:</u>
- Concrete floor.
- ~~Unstable and/or unacceptable soil conditions.~~
- ~~Any utilities (sewer, water, electric and/or gas) inside the building line.~~
- Any electrical switching and or disconnects for items beyond what is needed for SHELL quoted items.
- Ceiling finishes (IE: There are no dropped or finishes ceilings, the ceiling will be the exposed unpainted structural system).
- Interior finish of exterior walls
  (IE: If exterior walls are wood or steel studs, then the interior finish will be exposed insulation with vapor barrier, if precast or concrete block , then the interior finish will be exposed unpainted precast or concrete block, if Pre-Engineered then the interior finish will be exposed unpainted insulation and girts/purlins.
- Exit and emergency lighting.
- Any HVAC items.
- Any plumbing.
- Any Landlord's Work unless otherwise noted.
- Any Tenant Build Out Work unless otherwise noted.



A MATTRESS GIANT STORE FOR
FIRST ROCKFORD GROUP
DeKALB, ILLINOIS

LARSON and DARBY Inc.
ARCHITECTS · ENGINEERS · PLANNERS



Exhibit H

Employee Parking

EXHIBIT H



Area between asterisks is designated as Employee Parking

Exhibit I

Subordination Non-Disturbance and Attornment Agreement

# SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT

THIS AGREEMENT ("Agreement") made and entered into this _____ day of _____, 2001, by and among _____, a(n) _____ ("Subtenant"), SUNIL DEKALB, L.L.C., an Illinois limited liability company ("Sublandlord"), and the COUNTY OF DEKALB, an Illinois body politic ("Master Landlord").

## W I T N E S S E T H:

WHEREAS, Master Landlord as landlord, and Sublandlord as tenant, have entered into a Commercial Lease (as the same shall be amended from time to time, the "Master Lease") of the premises (the "Shopping Center") commonly known as the "DeKalb County Center" located at Barber Greene Road and Sycamore Street, DeKalb, Illinois which is more particularly described on Exhibit A which is attached hereto and made a part hereof; and

WHEREAS, Sublandlord and Subtenant have entered into a sublease a copy of which is attached hereto and made a part hereof as Exhibit B (the "Sublease") of certain premises located within the Shopping Center ("Subleased Premises"), which premises are more particularly described on Exhibit __ to the Sublease; and

WHEREAS, Subtenant, as a condition to entering into the Sublease has required the execution of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and to induce Subtenant to enter into the Sublease and, in consideration of Ten Dollars ($10.00) by each of the parties hereto paid to the other, receipt of which is hereby acknowledged, the parties do hereby covenant and agree as follows:

1.    The Sublease shall be subject and subordinate to the terms of the Master Lease in regard to the terms contained in Sections 5.2 (but Master Landlord further agrees that the term "Improvements" as defined in the Master Lease, shall not include the inventory of Tenant, personal property of Tenant and trade fixtures and trade equipment of Subtenant that are not permanently affixed to the Subleased Premises), 6.2 (including, but not limited to, the terms of Exhibit E), the last sentence of 6.3 (other than (ii) thereof), 6.10, 11.1 (in regard to the authorization to release sales tax information and the requirement for any Subtenant or its subtenant or assignee to execute Exhibit F to the Ground Lease as a condition, respectively, to the effectiveness of the Sublease, and any sublease or assignment thereof) of the Master Lease. Except as expressly set forth above, Master Landlord agrees that it will not hold Sublandlord, or if it should succeed to Sublandlord's interest under the Sublease, Subtenant, in default if any other provisions of the Sublease shall be in conflict with the Master Lease.

2.    Except as permitted by the terms of Section 1 above and subject to the provisions of Sections 3 and 4 hereof, Master Landlord shall not, in the exercise of any of the rights arising

1

or which may arise out of the Master Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof, disturb or deprive Subtenant in, or of, its possession or its right to possession of the Subleased Premises or any part thereof under the Sublease or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, except as above stated, provided that Subtenant is not in default under the Sublease beyond any applicable notice and grace periods.

3.    Subject to the provisions of Section 6 hereof, as an inducement to Master Landlord to enter into this Agreement, Subtenant and Master Landlord hereby agree that, in the event of the termination of the Master Lease by re-entry, summary proceedings or other action or proceedings or otherwise; and if (1) such Sublease shall, immediately prior to such termination, be in full force and effect, and (2) at the time of such termination Subtenant shall not be in default under the Sublease beyond any applicable notice and grace periods, then:

(A)    Subtenant shall not be (1) made a party in any action or proceeding to remove or evict the Sublandlord; and (2) evicted or removed or its possession or right of possession be disturbed or in anyway interfered with except in accordance with the terms of the Sublease; and

(B)    The Sublease shall continue in full force and effect as a direct lease from the Master Landlord to Subtenant under the terms and provisions set forth in the Sublease and this Agreement, and Subtenant shall attorn to Master Landlord from and after the date of such termination of the Master Lease, subject to the provisions of Section C below; and

(C)    Notwithstanding anything contained in the Sublease or this Agreement to the contrary, in no event shall,

(1)    Subtenant be entitled to credit against the Master Landlord if the Master Landlord shall become a direct landlord of Subtenant, as provided above, for any prepaid fixed rent and/or additional rent in excess of thirty-one (31) days prepaid fixed rent;

(2)    Master Landlord be:

(i) liable for any act or omission of any prior sublandlord (including Sublandlord);

(ii) obligated to cure any defaults of any prior sublandlord (including Sublandlord) which occurred prior to the time that Master Landlord or such new tenant of Master Landlord succeeded to the interest of such prior sublandlord under the Sublease;

(iii) subject to any offsets or defenses which Subtenant may be entitled to assert against any prior sublandlord (including Sublandlord) relating to an event or occurrence prior to Master Landlord's or such new tenant's succession to the interest of Tenant/Sublandlord under the Sublease;

2

(iv) liable or responsible for, or with respect to, the retention, application and/or return to Subtenant of any security deposit paid to any prior sublandlord (including Sublandlord), whether or not still held by such prior sublandlord, unless and until Master Landlord or such other successor to Sublandlord's interest has actually received for its own account as sublandlord for the full amount of such security deposit; or

(v) liable to complete any improvements to the Subleased Premises.

4.    From and after the termination of the Master Lease, other than as detailed in Paragraph 1 of this Agreement, Master Landlord shall succeed to all of the rights, interests, obligations, responsibilities and liabilities of Sublandlord under the Sublease, and it shall do so upon the terms and conditions stated in the Sublease and this Agreement.

5.    No modification, amendment, waiver or release of any provision of this Agreement shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the parties hereto.

6.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns under the Master Lease and Sublease.

7.    References herein contained to the term of the Master Lease and the term of the Sublease shall mean the term thereof as then extended pursuant to the provisions thereof.

8.    The agreements contained herein shall be self-executing without the requirement of any further instrument or act by any party referred to herein. The agreement shall be binding upon, and inure to the benefit of, each of the parties hereto and its successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

MASTER LANDLORD:

ATTEST:                                County of DeKalb, an Illinois body politic

_____          By:_____
                                          Director

3

Doc. No.: 646842 v2

**SUBTENANT:**

ATTEST:

_____

_____

_____

By:_____

**SUBLANDLORD:**

ATTEST:

Sunil DeKalb, L.L.C., an Illinois limited
liability company
By: Sunil Millenium Capital II,. L.P.,
Member

_____

By:_____

Sunil Puri, its General Partner

4

# EXHIBIT A

## LEGAL DESCRIPTION OF SHOPPING CENTER

Doc. No.: 646842 v2

# EXHIBIT B

## COPY OF SUBLEASE

Doc. No.: 646842 v2

## ADDENDUM TO LEASE

dated January 8, 2002
between
**SUNIL DEKALB, L.L.C.,**
**an Illinois limited liability company ("Landlord"), and**
**MATTRESS GIANT CORPORATION, a Texas corporation ("Tenant"),**
**DEKALB COUNTY SHOPPING CENTER ("Shopping Center")**

Notwithstanding any provision to the contrary contained in the Agreement of Lease, dated of even date herewith executed between Landlord and Tenant and concerning the Premises, Landlord and Tenant agree that the following provisions shall control the agreement of the parties, and supersede any conflicting provisions in the Lease:

1.    <u>Assignment and Subletting</u>. Tenant shall have the right to assign or transfer all or any part of the Premises and any of Tenant's rights and obligations under the Lease to a parent or affiliate corporation of Tenant or to a corporation with which Tenant or its parent or affiliate corporation may merge or consolidate, either in connection with the public offering of securities by such corporation or otherwise, and such assignment or transfer shall not be a violation of the assignment and subletting provisions of the Lease. In the event of any such assignment or transfer, Tenant shall not be released from all of Tenant's obligations to Landlord arising under the Lease, unless otherwise agreed between Landlord and Tenant. Tenant may also grant licenses and/or concessions without the consent of Landlord.

Any assignment or transfer of the Lease shall be executed by the assignor and the assignee. Each assignee shall, for the benefit of Landlord, agree to assume, be bound by, and perform all terms,

317903 v3 {00846-16}{14083}                    1                    Initials

covenants, and conditions of the Lease to be kept and performed by Tenant.  After execution of the assignment, Tenant will forward a completed copy thereof to Landlord.

    2.    <u>Subordination, Nondisturbance and Attornment</u>.

    (a)    With respect to the mortgage of record as of the date of the Lease, Landlord will deliver a Subordination, Non-Disturbance and Attornment Agreement in form and substantially similar to that contained in <u>Exhibit "I"</u> of the Lease.

    (b)    As a part of such subordination, nondisturbance and attornment agreement, if requested by any mortgagee, Tenant shall agree to provide to such mortgagee (simultaneously with notice to Landlord) notice of Landlord's defaults under the Lease and the same time periods for such mortgagee to cure such defaults as those provided Landlord in the Lease, together with such agreements as are typically found in nondisturbance and attornment agreements with institutional lenders as may be reasonably satisfactory to Tenant.

    3.    <u>Tenant's Financing</u>.  Tenant has secured financing and general credit lines and granted to its lenders, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment located at the Premises (collectively, the "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment (collectively, the "Collateral").  Landlord consents to such security interest and assignment, and agrees to give such lenders for which it has received notice thereof the same notice and opportunity to cure any default of Tenant as is provided Tenant under the Lease (including time to foreclose or otherwise take possession of Tenant's leasehold interest in the Premises, if necessary to effect such cure).  In addition, Landlord

2

Initials

_Sd_  _PL_

consents, subject to any of Tenant's rights, to the lenders entering upon the Premises at any reasonable time during the term of this Lease to take possession of and remove the Collateral from the Premises.

      4.    <u>Tenant's Property and Waiver of Landlord's Lien</u>. All of the Personalty shall be and remains the personal property of Tenant, removable by Tenant any time prior to, or before the expiration or earlier termination of the Lease and shall be so removed by Tenant at the request of Landlord before the expiration or termination of the Lease. Those improvements that are integrated into the physical structure of the Premises shall not be removed and shall become the property of Landlord. Tenant agrees to promptly repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings, equipment and Personalty (except for minor damage caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted.

      Landlord expressly waives its statutory or common law Landlord's lien and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the Personalty and other property of Tenant located in or on the Premises and further agrees to execute any reasonable instruments evidencing such waiver at any time hereafter upon Tenant's request.

      5.    <u>Permitted Lighting</u>. Landlord agrees that Tenant may install a neon lighting around the display windows in the store front of the Premises, as shown on the plans and specifications for improvements to the Premises approved by Landlord.

317903 v3 (00846-16)(14083)          3

Initials

6.     <u>Signage</u>.  Landlord agrees that Tenant may install neon vendor's signs so that such signs may be viewed from the exterior of the Premises.  In addition, Landlord has reviewed and approved plans for Tenant's proposed signage with regard to the Premises.

7.     <u>Self Help and Setoff</u>.  If Landlord fails to make any repairs or replacements or to otherwise comply with Landlord's obligations under the Lease as required by the Lease, Tenant may, after the occurrence of Default as that term is defined in Section 13.5 of the Lease,  at its option, make the repairs and replacements or perform Landlord's obligations and the costs of such repairs and replacements or performance shall be charged to Landlord by Tenant and may be setoff against the sums next due and owing to Landlord by Tenant under the Lease if Landlord fails to pay such sums within ten (10) days after demand therefore.

8.     <u>Compliance with ADA</u>.  Landlord agrees that Landlord will, at its sole cost and expense, cause the Premises to be delivered in compliance with the requirements, if any, imposed against the Premises by the Americans With Disabilities Act of 1990, or similar federal, state or local laws.

9.     <u>No Relocation</u>.  Landlord agrees that Tenant shall not be relocated or otherwise moved from the Premises without Tenant's prior written consent.

10.     <u>Events of Landlord's Default; Tenant's Remedies</u>.  Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default:" (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the rate of nine percent (9%) per annum (hereinafter defined); or (b) Landlord's failure to perform any

4

Initials
_____   _____

nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as it reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonably and actual cost of performance, including any and all reasonable transaction costs and reasonable attorneys' fees, plus interest at the rate of nine percent (9%) per annum, against the Base Rent and any and all other amounts and charges due Landlord hereunder upon presentation to Landlord of satisfactory evidence of such costs, or (ii) terminate this Lease and sue for damages, including interest, transaction costs and reasonable attorneys' fees.

11.     <u>Landlord's Warranties and Representations.</u> Landlord represents, warrants and covenants to Tenant that:

(i)     Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in

Initials

default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)     Landlord's leasehold interest in the Premises is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, which would restrict Tenant's use of the Premises for the Permitted Use or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Premises in accordance with the terms of this Lease. Nothing contained in this Lease shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party has the right to object to Tenant's tenancy hereunder. This representation and warranty is a material inducement to the Tenant's execution of this Lease.

(iii)     Landlord covenants that it is a duly constituted limited liability company under the laws of the State of Illinois, and that its Member who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the limited liability company.

(iv)     There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Premises which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

317903 v3 (00846-16)[14083]                    6                    Initials

_SL_    _PL_

(v)    Zoning and Subdivision.    The Premises are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises in accordance with the provisions of this Lease; and (B) the Permitted Use.

12.    Memorandum of Lease.    Upon request of either party, the other shall execute a memorandum of lease in proper form for recording, setting forth the Commencement Date and any other provision of the Lease.  Recordation of such memorandum of lease shall be at Tenant's sole cost and expense.

13.    Allowed Tenant Alterations.  Landlord hereby consents and agrees that Tenant may make nonstructural alterations not exceeding $10,000 in annual cumulative costs to the interior portions of the Premises as long as the alterations do not impair the safety of the Premises. "Alterations" to the plumbing, electrical and air conditioning systems of the Premises shall be deemed to be non-structural alterations as long as these alterations do not materially affect the roof, exterior walls, columns, beams, or foundation of the Premises.

14.    Rules and Regulations.  Landlord and Tenant agree that Tenant shall not be required to comply with any rule or regulation respecting Tenant's operations in the Premises unless the rule or regulation is uniformly applicable to all tenants of the Shopping Center.

15.    Exclusive.  Landlord agrees that so long as Tenant uses the Premises for the retail sale of mattresses, box springs, bed frames, bed headboards, brass bed pieces and related bedding and bedroom furniture and related items (the "Exclusive Items"), no other tenant or occupant of the

Initials
_SL_ _PL_

Shopping Center shall be entitled to use its premises for the sale of the Exclusive Items, subject to the rights of existing tenants set forth on Exhibit "E" of the Lease.

      16.    No Changes to Common Areas.  Landlord agrees that it will not change the Common Areas in the Shopping Center or allow construction of any improvements which would impair access to, parking, or visibility of the Premises without Tenant's prior written consent.

Initials